[No. S056425. June 1, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD ALLEN DAVIS, Defendant and Appellant.

## COUNSEL

Phillip H. Cherney, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Gerald A. Engler and Ronald S. Matthias, Assistant Attorneys General, and Bruce Ortega, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—A jury found defendant Richard Allen Davis guilty of the first degree murder of 12-year-old Polly Hannah Klaas (Pen. Code, § 187)[1] as well as the burglary of her home (§ 459), robbery (§ 211), kidnapping (§ 207, subd. (a)), and an attempted lewd act against her (§§ 664, 288, subd. (a)). As to the murder, the jury found to be true special circumstance allegations of burglary, robbery, kidnapping, and attempted lewd act upon a child under the age of 14. (§ 190.2, subd. (a)(17).) With respect to other crimes, the jury found that defendant personally used a deadly and dangerous weapon during the commission of these crimes, that he personally inflicted great bodily injury on the victim, and that he knew or reasonably should have known that his victim was 14 years old or younger. (§§ 12022, subd. (b), 12022.7, 211, 459, 667.9, subd. (a).)

The jury also found defendant guilty of two counts of false imprisonment (§ 236), two counts of assault with a deadly weapon (a knife) (§ 245, subd. (a)(1)), and two counts of robbery (§ 211) for crimes he committed against Polly's classmates, Kate M. and Gillian P. In addition, the jury found that defendant used a deadly and dangerous weapon in committing these crimes (§ 12022, subd. (b)), and that he knew or reasonably should have known that each of these victims was 14 years old or younger (§§ 211, 667.9, subd. (a)).

The jury further found that defendant personally inflicted great bodily injury on Polly Klaas after having served two or more prior separate prison

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

terms. (§ 667, subd. (a)(1).) Finally, the jury found that defendant had four prior serious felony convictions (§ 667, subd. (a)), and that he had served three prior prison terms (§ 667.5, subd. (b)).

At defendant's penalty trial, the jury returned a verdict of death. The trial court denied defendant's motion for a new trial (§ 1181) as well as the automatic motion to modify penalty (§ 190.4, subd. (e)), and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS AND PROCEEDINGS

### A. *Guilt Phase*

#### 1. *Prosecution's case*

##### a. *Defendant's release on parole: June to October 1993*

Defendant, who had a long criminal history that included convictions for assault, burglary, kidnapping, and robbery, was paroled from state prison on June 27, 1993. In early July 1993, defendant gained admission into the Turning Point Shelter in San Mateo, a transitional housing facility for the homeless. While at Turning Point, defendant initially worked at a precision sheet metal company, later as a painter.

On the weekend of August 21–23, 1993, defendant took a bus to visit his sister and brother-in-law, Darlene and Richard Schwarm, who lived on the Coyote Valley Indian Reservation in Ukiah. The bus stopped at a depot in Petaluma near Walnut Park and Wickersham Park, which were frequented by transients and drug users. That same weekend, defendant bought Richard Schwarm's 1979 Ford Pinto hatchback, after which he quit his job. He used the car to make several trips to Ukiah to visit the Schwarms from September through November 1993. During this period, defendant told an employee at Turning Point that he had gone to Petaluma to look for his mother, and on two different occasions he told one of his employers that he was visiting family in Petaluma.

At least four witnesses saw defendant loitering around Walnut Park and Wickersham Park in Petaluma in August and September of 1993. Defendant stood out because of his disheveled appearance, his yellow headband, his heavily tattooed arms, his public drinking, and his peppered-gray hair and beard. On at least one of those occasions, he was seen drinking and laughing in the park with his sister Darlene.

On either September 30 or October 1, 1993, defendant entered the Seductions adult store in Ukiah and bought a blue Rough Rider condom that the proprietor, Jeannette Turner, was "pretty sure . . . was studded or ribbed."

b. *The disappearance of Polly Klaas: October 1, 1993*

Eve Nichol lived with her daughters, 12-year-old Polly Klaas and six-year-old Annie, in a small three-bedroom house in Petaluma near Walnut Park and Wickersham Park.[2] On Friday, October 1, 1993, Polly had a slumber party at her home with two classmates, 12-year-old Kate M. and 12-year-old Gillian P.

Gillian arrived between 7:00 and 7:15 p.m. After a few minutes, she and Polly walked to a nearby convenience store, bought popsicles, and returned home. Their walk took them past Wickersham Park. Just before Kate arrived, Gillian and Polly went out to the front doorstep to wait for Kate.

Between 8:00 and 9:00 p.m., Kate arrived with her mother. As Kate's mother got back into her car, which was blocking the sidewalk, she saw a man walking straight at her vehicle, as if he was going to crash into it, so she jerked her car forward. The man wore dark clothing; he had rather bushy, gray and brown hair (possibly swept back in a ponytail); and he was carrying something that looked like a bag. Thirteen-year-old Kamika Milstead, a nearby resident, saw defendant get out of his car and head down the same sidewalk, carrying a bag or a box.

Meanwhile, the three girls played in Polly's bedroom. As Halloween was a few weeks away, Kate, who was dressed as a "hippie," and Gillian applied makeup to Polly's face to make her look "dead." Polly later changed into a white cotton denim skirt and a pink blouse that was tied into a knot in front, and removed most of the makeup.

Around 10:00 p.m., Nichol told the girls not to stay up too late and to keep the noise down, as she and Annie were going to bed. Nichol went to her bedroom, which was separated from Polly's bedroom by a bathroom and another bedroom. She read in bed for a few minutes, with Annie next to her, and she and Annie then fell asleep.

From 10:00 to 10:30 p.m., the three girls played board games and video games. Around this same time, nearby resident Taleah Miller was returning from a movie with her uncle. As her uncle was about to drop her off, Taleah saw defendant carrying a duffel bag and walking toward her house. Because

---

[2] Eve Nichol and Polly's father, Marc Klaas, had divorced in 1984.

Taleah was leery of homeless people, she asked her uncle to wait until the "scary looking" defendant passed the car. As defendant passed, he looked into the car and slid his hand over his face, as if to conceal it. Defendant was wearing dark clothing; he had combed-back, collar-length dark hair and a gray-patched beard.

Around this same time, Sean Bush, Aaron Thomas, and Thomas's girl-friend were watching a movie in Thomas's "granny unit" behind Polly's home. While Bush smoked a cigarette in Thomas's doorway, he could see Thomas's bathroom, which was separately located on Nichol's back porch. At about 10:30 p.m., Bush saw defendant walking calmly and slowly up the stairs to Thomas's bathroom. When defendant noticed Bush looking at him, he turned his head away and reached for the bathroom door. Bush described defendant as stocky with very thick and wiry hair that was styled straight back and lighter on top than on the bottom. Unaware that anything unusual was occurring, Bush resumed watching the movie.

Meanwhile, the girls decided to set up their sleeping bags. When Polly opened the bedroom door to retrieve the sleeping bags, she discovered defendant in the doorway holding a knife and a bag. Defendant said, "Don't scream or I'll slit your throats," and promised not to hurt them if they did what he said. He told the girls to lie facedown on the floor and not to look at him. Gillian and Kate initially thought defendant was a friend of Polly or her family who was engaged in a prank. Defendant asked, "Where is [*sic*] the valuables?" He repeatedly told them not to be scared and "he was only doing this for the money." Defendant wondered aloud why there were so many people present and expressed surprise when Polly told him that her mother was in the house. Polly said there was money in her jewelry box and asked him not to hurt her mother and sister. Defendant was calm at first, but he sounded more "frantic" as events unfolded.

All three girls lay down in a row on Polly's bedroom floor, and defendant tied their hands using a silky cloth, cords cut from Polly's Nintendo machine, and a strap from Polly's leather purse. He also gagged them with a silky cloth. He removed the cases from pillows in the bedroom and placed them over the girls' heads. At that point, Gillian no longer believed it was a joke.

Defendant told the girls that he was going to take Polly to show him where the valuables were, that he would then return Polly to Gillian and Kate, and that he would be gone after they counted to 1,000. Defendant then took Polly out of the room, promising he would not touch her. At that point, defendant had been in the bedroom for approximately 10 minutes.

After a few minutes' counting, with no sign of Polly, Gillian and Kate freed themselves, went to Nichol's bedroom, and told her what had happened. After they all unsuccessfully searched for Polly around the house, Nichol called 911 around 11:00 p.m. Nichol did not find any personal property missing from the home, but a pair of red leggings was later discovered missing from a chest of drawers in the bedroom.

### c. *Police encounter near Pythian Road: October 1, 1993*

Dana Jaffe lived with her 12-year-old daughter on a 192-acre parcel in Sonoma County, between Santa Rosa and Sonoma, on a rural hillside past the end of Pythian Road. From its intersection with State Highway 12, Pythian Road proceeds northward. At its end is a series of steep, curving, and narrow private roads, one of which leads to Jaffe's home. "No Trespassing" signs were posted on the private road leading to Jaffe's property, and her house was several hundred yards past a gate.

About 10:45 or 11:00 p.m. on October 1, 1993, Jaffe arrived home from work and relieved her babysitter, Shannon Lynch. About 11:15 or 11:20 p.m., Lynch began driving away from the Jaffe residence and, while still behind the gate, she saw defendant's Ford Pinto wedged against an embankment and stuck in a ditch with defendant hunched over the rear bumper. As she drove up, defendant appeared surprised to see someone else on the darkened road. Lynch stopped her car and defendant approached. He had bad breath and body odor, with leaves embedded in his hair as if he had been caught in the brush, and he was wearing a dark-colored long-sleeved sweatshirt that was inside out. She asked what he was doing, and he replied, "I'm stuck. I need some rope." When Lynch called defendant "illiterate" for not obeying the private road signs, he placed his hands on her window, told her to get out of her car, and demanded, "What's up the road?" Lynch remained in her car and told him there were people up the road who would call the police. She then drove off.

Frightened and upset, Lynch quickly drove to the nearest pay phone and, at 11:24 p.m., called Jaffe, urging her to call the police about a "scary guy" on her hill. Concerned about being alone with her young daughter, Jaffe dressed and got into her car with her daughter. As they drove down their private road they saw defendant's car but saw no one on the road. Jaffe drove to a pay phone and called the police at 11:46 p.m.

Some 15 minutes later, Sonoma County Sheriff's Deputies Mike Rankin and Thomas Howard arrived in separate cars and met Jaffe at the intersection of Pythian Road and Highway 12. Because the Sonoma County Sheriff's Department and the Petaluma Police Department used different radio frequencies, Deputies Rankin and Howard were unaware of Polly's abduction.

Jaffe led the officers back up the road, where they found defendant leaning against his car, smoking a cigarette. Jaffe told defendant he was on posted private property. Defendant acknowledged the signs but claimed that he had tried to turn and had become stuck in the ditch. Leaves, twigs, and other debris were in his hair and clinging to his socks, and he was wearing a yellow-and-blue-striped long-sleeved button-down shirt. Jaffe told him the officers would help him and she went home.

Deputies Howard and Rankin spoke to defendant, who smelled of alcohol and appeared to be sweating profusely. Deputy Rankin patted defendant down and noticed that defendant's pants were wet but his shirt was not. Defendant asked the officers, "What the fuck are you doing here?" and Rankin explained that the property owner wanted defendant removed for trespassing. Defendant claimed he was passing through the area from Oakland on the way to see a relative in Redwood Valley and had pulled off the roadway to do some sightseeing. He said he had tried placing dirt and brush under his car's wheel to get traction. The deputies, however, saw little indication of any dirt or other debris placed under the wheel. Deputy Rankin ran a check of defendant's license plate, but he transposed some of the numbers and did not notice that the car was not registered to defendant. Defendant said he was not on parole and had never been to prison.

Although defendant smelled of alcohol, Deputy Howard did not think he was intoxicated based upon the deputy's observations of defendant's pupils, balance, and speech. During a consent search of defendant's Ford Pinto, the deputies found a paper bag on the floorboard with three or four unopened Budweiser beer cans as well as two bags containing clothes, some of which appeared to be torn.

As the two deputies discussed ways to free defendant's car and made unsuccessful efforts to that effect, defendant became more relaxed. At one point, defendant opened a can of beer and began drinking it, but Deputy Rankin told him to pour out the beer.

After borrowing a chain from property owner Jaffe, the two deputies pulled defendant's car off of the embankment and out of the ditch. While Deputy Howard returned Jaffe's chain, Deputy Rankin escorted defendant as he drove down Pythian Road to Highway 12. When both deputies drove onto Highway 12 from Pythian Road, they saw defendant parked near the intersection. At 12:46 a.m. on Saturday, October 2, 1993, the deputies cleared the incident with dispatch.

d. *The discovery of the crime scene near Pythian Road: November 27, 1993*

Polly Klaas's abduction attracted national attention. During the early stages of the investigation, as many as 75 agents from the Federal Bureau of Investigation (FBI) and 50 Petaluma police officers canvassed Polly's neighborhood for evidence regarding her disappearance.

For nearly two months, the investigation received thousands of leads and tips. Defendant, however, was not linked with Polly's disappearance until November 27, 1993, when property owner Jaffe discovered, in a clearing a few feet from where defendant's car had been stuck on October 1, a pair of child-sized red knitted tights (knotted at the knee), an adult-sized dark sweatshirt (turned inside out), and a knotted piece of white silky cloth shaped like a hood. The hood was triangle-shaped with one knot at its broader end, two knots forming two loops at its apex end, and a concave area in the middle that appeared to have makeup smears on it. The soil in the clearing was exposed, as if someone had purposefully cleared the area of ground cover. That night, Jaffe called the sheriff's office, left a message, and called again the next morning.

On November 28, 1993, Deputy Sheriff Mike McManus arrived at Jaffe's property to inspect the scene. He and Jaffe found an unrolled condom one to two feet away from the clothes, a torn Rough Rider condom wrapper, two pieces of strapping tape, a beer bottle, an empty plastic six-pack holder, and a book of matches.

Jaffe told Deputy McManus of the October 1 incident involving defendant on her hillside. Because it was starting to rain, Deputy McManus was concerned about damage to trace evidence, and he did not follow normal evidence-collection protocol; instead of leaving the scene intact, he picked up the items and placed them in a box. He left the unrolled condom because he did not have materials in his patrol vehicle to collect such evidence and he believed it was a sealed container that would not be damaged by the rain. Later that day, an FBI team took photographs and recovered the condom.

Deputy McManus researched the October 1, 1993, incident on Dana Jaffe's hillside and determined defendant's identity and his prior criminal record of assault and kidnapping. He gave this information to the Petaluma Police Department. The Petaluma Police Department's lead investigator, Sergeant Michael Meese, examined the evidence collected by Deputy McManus with his department's lead evidence technician, Officer Larry Pelton, and they agreed that the hood-shaped white cloth matched cloth pieces found in Polly's bedroom. The next day, an FBI laboratory confirmed the match.

The Petaluma Police Department learned that defendant was a parolee who had an outstanding parole violation warrant against him based on an October 19, 1993, drunk driving arrest in Mendocino County. Defendant's parole officer told them that defendant was at his sister's home in Ukiah.

e. *Defendant's arrest and confessions: November 30 to December 6, 1993*

On November 30, 1993, Petaluma police officers and FBI agents arrived at defendant's sister's residence in Ukiah and arrested him, without incident, on the parole violation warrant. They also seized defendant's car and personal belongings. Defendant had shaved off his beard. Later that day, the officers transported defendant to the Mendocino County Sheriff's Department, where Petaluma Police Officer Pelton and FBI Agent Larry Taylor confronted him about Polly Klaas's kidnapping. Defendant denied any involvement.

Two days later, on December 2, 1993, criminalists matched defendant's palm print with a print found in Polly's bedroom. On December 4, 1993, after Petaluma Police Sergeant Meese had spoken to defendant in jail and encouraged him to contact Meese if there was any hope that Polly was still alive (see pt. II.D.3., *post*) defendant asked to speak to Meese and told him over the telephone, "I fucked up big time." He admitted that Polly was dead and agreed to help find her body.

That afternoon, Sergeant Meese met with defendant at the Mendocino County Jail where he, Sonoma County District Attorney Investigator Mike Griffith, and FBI Agent Larry Taylor questioned defendant for nearly two hours. Defendant claimed he went to Petaluma on the night of October 1, 1993, to contact his mother. Unable to find her, he went to a park, where he drank beer and smoked a marijuana cigarette that may have contained phencyclidine (PCP). Defendant said he did not have a clear recollection of what he did next. He recalled entering a home through a window and hearing some voices in a room, but he said he had never seen Polly Klaas before that point. He remembered tying the three girls up with items in the bedroom. He then recalled driving and suddenly realizing that he had Polly in the front seat of his car, when she complained that the bindings were too tight and her hands were going numb. Polly kept saying she wanted to go home. Defendant drove around for a while, confused about what to do, and got lost driving up Pythian Road, where his car eventually got stuck on Jaffe's property. He then untied Polly and placed her on the embankment where she remained while he tried to free his car, at which point the deputies arrived.

According to defendant, he waited for about 30 minutes after the deputies escorted him off Pythian Road before returning to the hillside and retrieving

Polly. He then drove to a gas station so Polly could use the bathroom. After leaving the gas station, defendant realized he had to kill Polly to avoid returning to prison, so he strangled her with a piece of knotted cloth. He later cinched a piece of cord tight around Polly's neck "just to make sure," then dragged her to some bushes and covered her body with a piece of plywood and chunks of wood that he found in the area. Defendant said he did not think that he had sex with Polly or that he tried to have sex with her.

That same evening, defendant, accompanied by Petaluma Police Sergeant Meese, FBI Agent Taylor, Sonoma County District Attorney Investigator Griffith and other law enforcement officers, retraced his route after Polly's kidnapping. When they arrived at Dutcher Creek Road, located 100 feet from Highway 101, just south of Cloverdale, defendant pointed the officers in the direction of Polly's body.

Polly's badly decomposed body lay under a piece of plywood and other pieces of wood in an area covered with thorny blackberry briar, thick underbrush, and debris. Her skeletonized skull lay a short distance from the rest of her body, probably as a result of animal activity. Much of her body had skeletonized, including her entire abdominal cavity, with soft tissues and organs all absent, but some portions of the body, including her limbs, had dried in a "mummified" state. Polly's remains were partially covered by the nightgown Gillian P. had brought to Polly's slumber party; according to an FBI agent who observed her body, the nightgown was pulled up and inverted under her arms, which were folded across her lap. Her pink blouse was untied and her white miniskirt had been pulled up to her chest, but she was still wearing her bra and panties. Her legs were spread outwards, bent at the knees and hips, which suggested that the body had not been haphazardly thrown into the brush or that rigor mortis had previously set the legs in that position.

Strands of Polly's hair, located separately from her body and skull, had a braided rope and a knotted cloth tangled within them. The examining pathologist, Dr. A. Jay Chapman, testified that the cause of Polly's death was "unascertainable" because of the condition of her body, but that the rope and knotted cloth could have fit around Polly's neck and might have been used to strangle her. During the autopsy, when members of the FBI's Evidence Response Team examined the remnants of Polly's panties with an alternative light source, a stain fluoresced, indicating the possible presence of semen. Further forensic testing, however, did not detect any semen at that location, which meant either that semen was never present or that it was present but had degraded so as to be unidentifiable.

After returning from the Dutcher Creek site on the night of December 4, defendant again described how he had strangled Polly with a piece of cloth. He added that when he eased up on the cloth, he thought he heard her groan, so he tightened up the cloth again and tied a knot. He then tied a cord around her neck and waited for Polly's movements to stop, which he described as taking "forever."

On December 6, 1993, Petaluma Police Sergeant Meese and FBI Agent Taylor questioned defendant again and confronted him with evidence that he had sexually assaulted Polly before killing her. Sergeant Meese told defendant that they found semen during an examination of Polly's remains. When defendant asked where the semen was found, Sergeant Meese responded, "on the body," to which defendant replied, "not in her though." Defendant denied sexually assaulting Polly. When asked how semen could have wound up on Polly's body, defendant replied, "Look I told you at least it wasn't in her." He added: "What I'm trying to tell you is that in my mind, at least I didn't try to stick my dick in the fucking little girl." When pressed again about the semen, defendant responded, "that's something that I'm going to have to live with and run through my mind over and over and over and over again." He also claimed it was a "load off" his mind and he was "glad" when FBI Agent Taylor told him that semen was found on Polly but not necessarily in her because he did not want that "hanging over" him. Defendant expressed concern that he would be mistreated in prison if other inmates considered him a child killer and molester. At the end of the interview, defendant said: "I have to see what comes out of forensic—hope nothing comes up. Hope nothing's in there."

### f. *Forensic evidence*

FBI Special Agent Chris Allen concluded that the pieces of white cloth found in Polly's bedroom, at the Pythian Road site where defendant's car had been stuck in a ditch,[3] and in Polly's hair at Cloverdale had been cut by scissors from a larger piece of nylon cloth, which might have originally been an article of lingerie or a nightgown, as the pieces of cloth all fit together like pieces of a puzzle. Allen believed the cloth could have been cut inside defendant's car, because fibers matching the cloth were found on the car's center console and rear passenger floor.

Fibers matching the carpet fibers in defendant's car were found in Polly's bedroom. Cotton fibers recovered from defendant's sweatshirt found at the Pythian Road site were consistent with fibers from Gillian's nightgown found

---

[3] The place where defendant's car had been stuck was not on Pythian Road itself, but on the private road leading from Pythian Road to Dana Jaffe's home. At trial, the parties referred to this location as the "Pythian Road site"; for convenience, we will do the same.

on Polly's body at Cloverdale. Fibers found in Polly's hair were consistent with the carpet fibers in defendant's car, suggesting that her head might have come in contact with the floor of his car.

One of Polly's hairs was found intertwined in a knot on the red tights recovered at the Pythian Road site, and it appeared to have been forcibly removed from her head. Two hairs found in Polly's bedroom matched defendant's DNA profile, and they also appeared to have been forcibly removed from defendant's head.

Examination of the condom and condom wrapper found at the Pythian Road site did not reveal the presence of any fingerprints or biological evidence.

### g. *Defendant's prior crimes*

On September 24, 1976, defendant, then 22 years old, abducted 26-year-old Frances M. at knifepoint from the South Hayward BART (Bay Area Rapid Transit) station as she entered her car. Pushing Frances into the passenger seat and placing a paper bag containing twine behind the seat, defendant took her keys and drove off, claiming he would not hurt her and he needed to get away because someone was following him. Defendant, who smelled of alcohol, hit Frances on the head and told her to stop crying. Defendant eventually pulled over and exposed his flaccid penis, but as he tried to push Frances's head down to his crotch, she grabbed the blade of his knife with one hand, used her other hand to open the door, and ran from the car. Frances flagged down a passing car, which happened to be occupied by an off-duty California Highway Patrol officer who chased defendant and arrested him. Defendant later told a court-appointed psychiatrist, Dr. George Ponomareff, that he had attacked Frances because he heard "a voice of a woman wondering what it would be like to be raped." Defendant also stated that Frances "wanted it" and "was only protesting for the sake of appearance."

In December 1976, defendant, who had been transferred to Napa State Hospital after faking a suicide attempt, escaped and engaged in a five-day crime spree.

On December 16, 1976, defendant broke into the Napa home of Marjorie Mitchell and beat her on the head with a fireplace poker while she slept. After she screamed, defendant dropped the poker and walked out of the room. Mitchell, her head bleeding, went to the bathroom to get a towel and saw defendant standing at the end of the hallway. Mitchell began walking towards him, but he fled. Defendant later told police that he was surprised Mitchell

was still alive. He said he had intended to look for her car keys, but he forgot about the keys after he hit her. Defendant explained that he had hit her "to relieve tension" and that committing violent acts was "how he relieved tension." "It felt good. I felt glowing. We both got something out of it," he later told Dr. Ponomareff. Defendant told another court-appointed psychiatrist he believed Mitchell "wanted to know how it felt to be beaten." Mitchell required 30 sutures to close the wounds on her head.

Defendant told police that he remained in Mitchell's neighborhood for the next few days, hiding under a tarp in a fishing boat that was parked on a trailer, and that he entered an open garage to a nearby house on Linden Street, stealing a metal file, which he used to sharpen a kitchen knife he carried with him. Defendant turned off the power to the house, intending to use his knife to steal a vehicle from the female resident as she came out to investigate, but his plan was thwarted when the intended victim did not come out as expected.

On December 20, 1976, defendant broke into 40-year-old Hazel Frost's car, pointed a shotgun at her neck, and told her to drive to Santa Rosa. After a half-hour drive, he ordered her into a dark gas station, and he pulled out white tape or gauze from his pocket. Frost rolled out of the car, grabbing a gun she kept underneath the seat. As defendant fled, she fired four or five times at him. Defendant later told police he wanted Frost's car to get to San Mateo County, and told Dr. Ponomareff that, before his attack on Frost, he had again heard the voice of a woman wondering "what it would be like to be kidnapped and assaulted." He told another court-appointed psychiatrist that he had decided he "would have some fun with the lady and assumed that from her attire and her single status she was looking for the same."

On December 21, 1976, Josephine Kreiger, a bank employee, returned to her La Honda home in San Mateo County and discovered it had been ransacked with some of her jewelry and coins missing. Responding police officers found defendant hiding under a bush with an unloaded shotgun on the ground next to him and two knives on his person. Defendant admitted he had burglarized Kreiger's home. He explained that he had intended to wait for the residents to return home, at which time he planned to tie them up and steal their car, but that he gave up on the plan when more people than he expected came home. Defendant later also told Dr. Ponomareff he thought there were people inside the Kreiger home who wanted to be tied up.

Defendant told a court-appointed psychiatrist that he masturbates twice daily while thinking of the female victims of his past crimes, and that he imagines tying them up.

The prosecution introduced evidence of defendant's convictions for the crimes against Frances M., Mitchell, Frost, and Kreiger. The prosecution also introduced evidence of defendant's convictions for three second degree burglaries occurring in the summer of 1973, May of 1974, and December of 1976; receiving stolen property in December 1976; armed burglary and kidnapping in November 1984; and attempted armed robbery in March 1985.

### h. *Paraphilia*

Dr. Park Elliott Dietz, a clinical professor of psychiatry in the biobehavioral sciences at the University of California, Los Angeles School of Medicine, testified as to a sexual disorder known as "paraphilia." He explained that paraphilia, a classification in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders—Fourth Edition (DSM-IV), is defined as "a continuing preference for some unusual sexual object . . . , [a]nd that means . . . individuals who are aroused sexually by people of the wrong age, by objects that are not people, or activities that are unusual or harmful." For some paraphiliacs, arousal is generated by the desire to control, render helpless, and humiliate the real or imagined sex partner. In a particular deviation called "cordophilia," the paraphiliac uses bindings to keep the sexual partner subservient. Intricately prepared bindings, corded or rope bindings, or silky bindings made from "feminine materials" may be particularly sexually stimulating to the paraphiliac. Some paraphiliacs use unconsenting victims to fulfill their sexual desires. In such cases, the paraphiliac will formulate a plan, prepare the weapons and bindings, pick a suitable victim, control the victim, and take the victim to a secluded location to enact the sexual fantasy. Impotence and other sexual dysfunctions are common among paraphiliacs. A paraphiliac in his 40's, Dr. Dietz stated, may still have the same sexual preferences he had in his 20's.

In Dr. Dietz's opinion, defendant's prior crimes involving Frances M., Mitchell, and Frost were "consistent" with the stages of a sexual assault by a paraphiliac, using weapons and preparing bindings for use on lone female victims. In describing defendant's crime against Frost, Dr. Dietz stated his opinion that defendant selected her to commit a sex crime. Dr. Dietz explained that defendant's justifications for some of his crimes did not make sense and appeared to be rationalizations for sexual offenses. In Dr. Dietz's view, defendant's statement that he masturbated twice a day while fantasizing about tied-up crime victims was strong evidence that he was a paraphiliac.

Dr. Dietz believed that defendant's behavior in the kidnapping and murder of Polly was "consistent" with paraphilia.

### 2. Defense case

The defense conceded that defendant had killed Polly, but asserted that the evidence did not show that he sexually assaulted her.

The defense called as witnesses Petaluma Police Sergeant Meese and Sonoma County District Attorney Investigator Mike Griffith to impeach the testimony of Jeannette Turner, who had testified under a grant of immunity for an unrelated fraud case, regarding her inconsistent statements about whether defendant had purchased a particular condom from her adult store just before the crimes.

The defense also presented testimony from defendant's parole officer, Thomas Berns, about his contacts with defendant in August and September 1993, in an attempt to show that defendant could not have been in Petaluma before the crimes as frequently as the prosecution's eyewitnesses had claimed.

### 3. Defendant's conduct after the guilt phase verdict

After the jury returned its verdict at the guilt phase of trial, defendant turned toward the television cameras in the courtroom and made an obscene gesture with both hands by extending his middle fingers. He then winked his eye and blew a kiss.

### B. Penalty Phase

### 1. Prosecution's case

#### a. Defendant's prior violent offenses

Marjorie Mitchell, Frances M., and Hazel Frost, who had been assaulted by defendant in 1976 (see pp. 560–562, *ante*), described being frightened, missing work, and losing sleep as a result of defendant's violent crimes against them. Mitchell described the wound to her head, which required 30 sutures to close, and said that she still experienced periodic headaches from the blows. She and her daughter consulted a psychiatrist, and she began locking her doors and covering her windows at night. Frances M.'s hand was severely cut during her escape and required treatment at the hospital. Frost described herself as "a basket case" until defendant was arrested. She received psychological counseling and took medication for several years to help cope with her fears.

The prosecution also presented evidence of the facts underlying defendant's November 1984 convictions for armed burglary and kidnapping, for which he had been released on parole when he committed the current offenses against Polly Klaas. Defendant and his then girlfriend, Susan Edwards, forcibly entered Selina Varich's residence in Redwood City. Edwards and her sister, Sandra Brinkley, had previously extorted over $15,000 from Varich by threatening to reveal Varich's prior lesbian relationship with Brinkley to members of Varich's family. When defendant and Edwards confronted Varich, she reached for her telephone, but either defendant or Edwards pulled it off the wall. Defendant threatened to kill Varich and members of her family if she did not go to her bank and pay him and Edwards $6,000. Varich described defendant as the person "in charge of the situation," who intimidated both her and Edwards. When Varich tried to run to her deck, defendant dragged her back inside and struck her on the head with a gun, causing profuse bleeding.

Defendant and Edwards attempted to silence Varich's cries, forced her to shower to wash off the blood, and ordered her to lie on her bed. Defendant then gave his gun to Edwards, who drove with Varich to the bank to obtain the $6,000, after which she ordered Varich to drop her off at a location where she had arranged to meet defendant. Varich required eight sutures to close her head injuries, and missed about a week of work. She described being "absolutely terrified," locking her doors and sleeping with the radio and lights on, until defendant was arrested several months later.

The prosecution presented evidence of seven robberies and one attempted robbery defendant committed between December 1984 and March 1985 in Kennewick, Washington, and Modesto, California. In each instance, defendant, with Edwards as his getaway driver, entered a bank, a restaurant, or a retail store and robbed persons at gunpoint. In 1989, defendant, in an effort to retaliate against Edwards (who had failed to make good on a promise to help him while he was in prison for the crimes against Varich), confessed that he and Edwards had committed the robberies. He was convicted of only one of the offenses—an attempted armed robbery in March 1985.

b. *Victim impact testimony*

Polly Klaas was born January 3, 1981. She was described as funny, intelligent, and beautiful, "an absolutely extraordinary child" who was warm-hearted with a sunny disposition and an infectious laugh. She played the piano and the clarinet, and had a particular love for acting on stage. She was afraid of being alone in the dark, often sleeping with her lights on and fearful that "a bad man would come and take her in the night."

Although Polly's mother, Eve Nichol, did not testify at the penalty phase, Petaluma Police Sergeant Meese described her, on the night of Polly's abduction, as being "in a state of shock and anguish," which was reflected in a photograph taken of Nichol with her six-year-old daughter, Annie, that night. Nichol's father (Polly's maternal grandfather), Eugene Reed, drove up to see his daughter soon after Polly's abduction and found her "in deep shock," describing her as being "too numb to even cry."

Polly's father, Marc Klaas, who was divorced from Polly's mother, maintained a very close relationship with Polly, seeing Polly every weekend and talking to her almost daily. In the weeks before Polly's remains were discovered, he helped establish a volunteer center to direct the search for her. During this period, he abandoned his successful car rental business, lost 30 pounds, developed a severe sleep disorder, and began seeing a therapist. After learning that Polly was dead, he went "berserk" and became so enraged that members of his family had to restrain him. It was an anger that, he said, "carries on to this day." He became a child advocate, promoting "an agenda to spare other children from her fate." He continued to have sleep disorders, often experiencing dreams and nightmares about Polly, and continued to see a therapist.

Polly also enjoyed a close relationship with her maternal grandfather, Eugene Reed, often visiting him and his wife at their home on the Monterey Peninsula, where she would play music with him and take walks on the beach. Reed described the 64 days Polly was missing as "just about the worst time we ever had in our lives." Even worse was the discovery that Polly was dead. In her memory, he and his wife put up a bench in Pacific Grove facing the ocean with an inscription for Polly.

## 2. *Defense case*

Defendant spent his early years in South San Francisco, where his mother, Evelyn Smith, and his father, Robert Davis, lived with defendant's maternal grandmother, Norma Wasson Johnny (a Paiute Indian), and his stepgrandfather George Johnny. Defendant had two younger sisters, Patty and Darlene, and two older brothers, Don and Ron.

Defendant's father eventually moved the family into a small house in the rural mountain town of La Honda, in San Mateo County. Soon after, when defendant was about nine years old, his parents separated, and the children and their mother returned to the home of the Johnnys. After a bitter divorce in 1965, the children were eventually allowed to choose which parent they wanted to be with. Defendant's two older brothers stayed with their mother

while defendant (then 12 years old) and his two younger sisters chose to live with their father. At some point, defendant's brother Don returned to live with his father.

Defendant's father moved the family frequently, sending the children to live, at various times, with his mother in Chowchilla, with the Johnnys, and briefly in Half Moon Bay and in Reno, eventually settling down again in La Honda. When defendant was 14 years old, his 10-year-old sister, Patty, died of an illness.

Defendant's family members and caretakers described him as an average, "nice little boy," who was sometimes rambunctious but very lovable and cute. As he grew older, defendant became quiet, shy, and subdued, but very protective of his sisters, often taking responsibility for their welfare and making sure they went to school and did their homework.

Defendant's mother drank frequently, was cold and distant to her children, never hugged or kissed them, and made little or no effort to remain in touch with them after their father gained custody of them. At the funeral of 10-year-old Patty, the mother made no attempt to talk to defendant or his siblings.

Defendant's father was a longshoreman; during the week he was away, but he returned to the family on some weekends. When he was present, he often was gruff and harsh with the children. There was conflicting evidence as to whether he had a problem with alcohol. On occasion, he hit defendant, once breaking defendant's jaw. When the father was away, various women, who were either hired caretakers or romantically involved with him, took care of defendant and his siblings, but at times they were left alone at home.

According to defendant's juvenile probation reports, he committed his first offenses (a burglary and forging a $10 money order) when 12 years old while he was living in Chowchilla with his paternal grandparents. Defendant returned to live with his father, was remorseful, appeared amenable to rehabilitation, made good progress, and did better in school. He successfully completed his juvenile probation, but at the age of 15 he burglarized a home in La Honda. He again successfully completed probation, but he did poorly in school.

Employees of the California Men's Colony at San Luis Obispo, where defendant was incarcerated in the 1980's and early 1990's, described defendant as an exceptionally skilled and productive metalworker and a cooperative metal shop student. One of his metal shop instructors estimated that defendant's metalworking skills saved the state millions of dollars in manufacturing and installation costs. As a result, defendant was considered part of an "elite group" of inmates.

James Park, a psychologist, retired prison administrator, and part-time prison consultant, testified regarding the security designation applied to all prisoners serving sentences of life imprisonment without the possibility of parole ("Level 4" inmates). Level 4 institutions are characterized by high security features with no conjugal visits. Based on his review of defendant's prison records, he concluded that defendant had been "useful and productive" in prison, with few serious disciplinary incidents over 20 years. Dr. John Irwin, an expert on prisoner institutionalization, concluded from defendant's prison record that he was a "conforming prisoner that causes very little trouble," and that he was an "asset" and "model prisoner" who would have no difficulty adjusting to the routine of incarceration.

Clinical Psychologist Lorelei Sontag compiled a social history of defendant based on interviews of defendant, members of his family, and a neighbor as well as on letters, juvenile probation records, school records, medical records, and divorce records. In defendant's early years, he was exposed to serious domestic violence between his parents. A neighbor reported seeing the mother hold defendant's hand over a flame on a stove to punish him for playing with matches when he was three years old. Defendant did not cry and appeared unreactive, which Dr. Sontag found "very alarming" and a sign that defendant was "developmentally askew." In a second incident, Evelyn burned the hands of defendant and his brothers after catching them smoking.

According to Dr. Sontag, defendant later might have felt responsible for his mother's emotional rejection of him and his sisters, after their parents' divorce, when they chose to live with their father. Although the father did provide for the family financially, he often provided no emotional support to his children, especially the boys. Once, he struck defendant hard enough to push him through a Sheetrock wall. When defendant was 16 years old, he ran away from home and asked juvenile hall authorities to place him with a foster family. Defendant's juvenile probation officer eventually recommended enlisting in the Army. Defendant did so in July 1971.

Psychiatrist George Woods diagnosed defendant as having avoidant personality disorder, antisocial personality disorder, and schizoid personality disorder, based upon his interviews of defendant and a review of many reports and records. According to Dr. Woods, individuals with personality disorders often make "self-destructive and damning" decisions. Dr. Woods found no indication that defendant suffered from any neurological problem or brain damage. He described defendant's intelligence as average, based upon intelligence quotient (IQ) tests in 1975 and 1985, on which defendant scored 129 and 105, respectively. Although the IQ score of 129 indicated above average intelligence, Dr. Woods noted that defendant failed his first attempt to pass the General Educational Development test at age 20 in 1974 and that his

performance on that exam was consistent with a 10th grade level, the point at which defendant dropped out of school.

On cross-examination by the prosecution, Dr. Woods acknowledged that after defendant's crimes against Frances M. in 1976, he faked a suicide attempt and falsely claimed he heard voices in his head to support an insanity defense.

### 3. Prosecution's rebuttal

Witnesses from the Turning Point facility described defendant as a very sociable person who had admitted to them he had tried to manipulate the system by feigning mental illness so he would be moved into a mental health facility, so it would be easier for him to escape. Correctional officers testified that they saw no signs that defendant had mental problems while he was in jail for the current crimes.

Psychiatrist Leonti Thompson, who had examined defendant in 1978 for a court-ordered mental evaluation, disagreed with Dr. Woods's diagnosis and found defendant's behavior consistent only with antisocial personality disorder.

Clinical therapist and Forensic Psychologist Kathleen O'Meara reviewed defendant's records and concluded that the defense allegations of childhood abuse were exaggerated, although she acknowledged that defendant's family was seriously dysfunctional. Disagreeing with Dr. Woods's diagnosis, she expressed the view that defendant suffered from antisocial personality disorder and sexual sadism, which motivated his prior sexual offenses. In her opinion, defendant's childhood would not necessarily cause him to commit the crimes he was convicted of as an adult, and she mentioned that defendant's brother Don had told her he did not believe that defendant's childhood was the cause of his problems. She also noted that, notwithstanding adverse circumstances during childhood, individuals can motivate themselves to adapt to normal adulthood, as had defendant's brothers Ron (who became a highway patrol officer, studied law, and later became a tribal magistrate in Nevada), and his brother Don (who had a stable marriage and was employed at Lockheed).

### 4. Sentencing hearing

Before the trial court denied defendant's automatic motion for modification of the death verdict (§ 190.4, subd. (e)) and imposed sentence, Polly's father, Marc Klaas, and her grandfather, Eugene Reed, asked the court to sentence defendant to death. The court then allowed defendant to read a statement in

which he complained at length about the failure of the police to provide him a lawyer after he invoked his right to counsel, and said he only confessed, after not seeing a lawyer for four days, because he assumed no attorney wanted to represent him because of the infamy of the case and because Petaluma Police Sergeant Meese had exploited defendant's symptoms of nicotine withdrawal. Defendant asserted that, because of the "intentional disregard" of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*)), his attorneys were forced to admit guilt on some of the charges against him. At the close of his statement, defendant set off a commotion in the courtroom when he claimed he knew he did not commit a lewd act upon Polly "because of a statement the young girl made to me when walking her up the embankment: 'Just don't do me like my dad.' " After pronouncing defendant's sentence of death, the trial court concluded the proceedings by stating, "Mr. Davis, this is always a traumatic and emotional decision for a judge. You've made it very easy today by your conduct."

## II. PRETRIAL ISSUES

### A. *Change of Venue to Santa Clara County*

Defendant claims the trial court violated his right to a fair trial when, after granting defendant's motion for a change of venue, it transferred the case to Santa Clara County, rejecting a defense request to hold the trial in a county farther from the location of the murder. As we explain, we find no error.

#### 1. *Facts*

Venue was originally in Sonoma County, as all of defendant's charged crimes took place in that county. After more than six weeks of jury selection, however, the parties and the assigned Sonoma County trial court judge, Lawrence Antolini, agreed that a change of venue was necessary because of concerns that defendant could not receive a fair and impartial trial in Sonoma County.

During the change of venue proceedings, the trial court noted that the search for Polly Klaas had created enormous "personal involvement" for residents of Sonoma County that "surprised probably all of us, even those who have been born and raised in this county." In addition, despite the court's repeated admonitions during the sequestered jury selection, prospective jurors often discussed the case in the waiting areas, making inflammatory comments about defendant's guilt and calling for his execution, with some expressing the desire that defendant be castrated by means of a rope and a truck.

The Administrative Office of the Courts proposed San Diego, Los Angeles, Fresno, and Santa Clara Counties as possible venue sites. (See Cal. Rules of Court, former rule 842, now rule 4.152.) After the parties were unable to agree as to the new venue site, the trial court appointed Steven Schoenthaler, Ph.D., a professor of sociology at California State University, Stanislaus, to conduct telephone surveys of the four candidate counties as well as Sonoma County (used a basis for comparison).

The survey sampled 300 people per county, consisted of 21 questions, and was designed to measure knowledge of specific facts obtained from pretrial publicity, the magnitude of prejudgment of defendant's guilt, and the magnitude of prejudgment of defendant's penalty.

At the hearing to determine the new venue site, Professor Schoenthaler presented the results of the survey for each county in question and then extrapolated the data using six models to analyze the survey results. His preferred model was his "Model 1" because, in his view, it best minimized the probability of error. Model 1 focused on those participants who had prejudged defendant as guilty (and could not set aside this opinion or were unsure about their ability to set aside this opinion) and/or those who had prejudged defendant as deserving the death penalty (and were absolute in their belief as to this penalty). To focus on the effect of pretrial publicity, Schoenthaler included only participants who recognized at least one of three facts: the kidnapping of a little girl from her Petaluma home, the name Richard Allen Davis, or the name Polly Klaas; and he subtracted participants who could not recognize any of these facts. According to these criteria, Model 1's publicity-induced "total prejudgment" rate was 55 percent in Sonoma County, 37 percent in Santa Clara County, 34 percent in Fresno County, 27 percent in Los Angeles County, and 21 percent in San Diego County.

Professor Schoenthaler testified that the 16-percent-point difference in his Model 1 prejudgment rate between Santa Clara and San Diego Counties was statistically significant and would translate to two fewer eligible potential jurors per panel of 12 in Santa Clara County. Using the same criteria, but focusing only on those prejudging defendant as deserving the death penalty and being absolute in that belief, Schoenthaler calculated the sentence prejudgment rate as 12 percent in Sonoma County, 4 percent in Santa Clara County, 13 percent in Fresno County, 11 percent in Los Angeles County, and 6 percent in San Diego County.

Because the case had generated massive publicity, the percentage of survey participants who were unaware of the case (those who were unaware of the kidnapping of a little girl from her Petaluma home and did not recognize the

names Richard Allen Davis or Polly Klaas) was only 1 percent in Sonoma County, 4 percent in Santa Clara County, 7 percent in Fresno County, 21 percent in Los Angeles County, and 22 percent in San Diego County. In Schoenthaler's opinion, based on his Model 1 for prejudgment of both penalty and guilt, San Diego County was the best venue site for the defense, followed by Los Angeles, Fresno, and Santa Clara. Aside from a high rate of prejudgment of penalty in Fresno County, Schoenthaler found no statistical difference among the remaining counties.

The prosecution's expert, Ebbe B. Ebbesen, Ph.D., a professor of psychology at the University of California, San Diego, presented his own four models to measure prejudgment. Although these models showed that, of the four candidate counties, San Diego had the lowest prejudgment (or tied for lowest with Los Angeles) and Santa Clara had the highest prejudgment, in Ebbesen's view, the ability of participants to set aside their knowledge of the case and their opinions of defendant's guilt did not differ significantly among the four candidate counties. He based this opinion on a survey question asking participants if they could set aside their opinions of defendant's guilt and base their decision on the evidence presented in court alone. The percentage of participants who answered yes to this question was 46 percent in Sonoma County, 58 percent in Santa Clara County, 60 percent in Fresno County, 63 percent in Los Angeles County, and 67 percent in San Diego County. According to Professor Ebbesen, the only significant difference was between Sonoma and the remaining four counties, a finding that, in his opinion, reflected the unsuccessful attempt to select a jury in Sonoma County.

Professor Ebbesen's analysis showed that in each of the candidate counties, the more a participant knew about the case, the greater the likelihood that he or she would prejudge defendant as guilty and deserving a death sentence. Ebbesen found no significant differences between the counties with regard to the participants' prejudgment of penalty, with the percentage of participants selecting the death penalty being 59 percent in Sonoma County, 61 percent in Santa Clara County, 62 percent in Fresno County, 56 percent in Los Angeles County, and 57 percent in San Diego County. As the effect of pretrial publicity did not appear to generate particularly strong, fixed opinions of guilt, Professor Ebbesen theorized that no matter where the case was tried, publicity would shift to that county, thereby increasing knowledge and prejudgment and creating a "saturation" level at the time of jury selection that would "equalize" differences in knowledge or prejudgment measured by the survey.

According to Professor Ebbesen, jury selection in Sonoma County had failed because prospective jurors were "emotionally involved" in the case, which resulted from the circumstance that the crime had occurred in their

"backyard," making it more difficult for them to set aside their opinions. This factor, he noted, would be absent in other counties. He acknowledged that the survey was not specifically designed to measure this factor.

Professor Schoenthaler agreed with Professor Ebbesen that transferring the case to a new county would generate more publicity in the new venue, but he disagreed with Ebbesen's conclusion that this would equalize the level of knowledge among the candidate counties, because each county started with a different knowledge level. He conceded, however, that there might not be a statistically significant difference if trial were to begin more than 90 days after selection of the new venue, because the increased publicity would spread knowledge and eventually infect potential jurors in the new venue "like the flu."

The defense expert, Edward J. Bronson, Ph.D., a professor of public law at California State University, Chico, presented several of his own models, including "Model 4," which calculated the percentage of participants who were "absolute" in their opinion that defendant should receive the death penalty but excluded those who had no knowledge of the case. In Model 4, the percentage of participants who recognized the case and had an "absolute" belief that defendant deserved a death sentence was 45 percent in Sonoma County, 41 percent in Santa Clara County, 43 percent in Fresno County, 32.3 percent in Los Angeles County, and 31.3 percent in San Diego County. In "Model 5," Professor Bronson created a category of "high risk respondents," comprising those who recognized the kidnapping of a girl from her home in Petaluma or the name Polly Klaas, who prejudged defendant as guilty beyond a reasonable doubt and could not or were unsure if they could set that opinion aside, and who determined death was the appropriate penalty. The percentage of participants who met this "high risk" category, Bronson testified, was 28.7 percent in Sonoma County, 19.3 percent in Santa Clara County, 14.3 percent in Fresno County, 11.7 percent in Los Angeles County, and 8 percent in San Diego County.

Professor Bronson testified that his Models 4 and 5 and Professor Schoenthaler's Model 1 demonstrated "substantial differences" between the candidate counties. The models showed a "continuum," with Santa Clara County "the worst" and prejudgment dropping off as one headed southward, with San Diego County being "the best." He was particularly concerned about Santa Clara, as it was in the Bay Area, not far from Sonoma County, where the crimes occurred. Bronson disagreed with Professor Ebbesen's conclusion that the survey participants in each of the four candidate counties showed equal hostility toward defendant. According to his analysis, the percentage of participants who expressed strong feelings and/or hostility toward defendant was 18 percent in Santa Clara County, 13 percent in Fresno

County, and 9.67 percent in San Diego County (Bronson did not have time to examine the results in Los Angeles or Sonoma County).

Professor Bronson disagreed with Professor Ebbesen's theory that publicity following the change of venue would equalize the degree of prejudgment. He reasoned that the "baseline" for each county was different and beliefs that have been held for a couple of years tend to be more deep seated than beliefs created by new information. He stated that a county's population size was important because larger communities could better "absorb" the impact of a large case such as this. He gave these population estimates for the pertinent counties: 432,000 in Sonoma, 1,607,700 in Santa Clara, 764,800 in Fresno, 9,244,600 in Los Angeles, and 2,720,900 in San Diego.

All three experts agreed that, generally speaking, participants' knowledge of the case and their prejudgment dropped the farther away they were from Sonoma County.

The parties stipulated that Santa Clara County would be the most convenient and least expensive venue for travel and hotel costs.

In deciding to set the case in Santa Clara County, the trial court expressed the view that an unbiased jury could have been selected in Sonoma County if its residents had not been so personally involved in the search for Polly Klaas, the prayers at local churches, her memorial service, and the amount of social networking in the county. The court discounted the models presented by the prosecution and defense experts and gave greatest weight to Professor Schoenthaler's Model 1, noting that any difference in prejudgment of penalty was negligible between Santa Clara and San Diego Counties under that model. The court compared San Diego with Los Angeles and Fresno Counties; it concluded that Los Angeles was not substantially different from San Diego in costs and hardship and that Fresno, although less costly, had a higher prejudgment of penalty because of publicity, making San Diego the preferred county among the three. Comparing San Diego with Santa Clara, the court found that the cost and hardship to the witnesses would be substantially less in Santa Clara County and that this benefit outweighed the 16-percentage-point difference in total prejudgment between the two counties because this difference would only necessitate identification of an additional 16 out of 100 potential jurors during jury selection in Santa Clara. The court noted that Santa Clara County's population (though smaller than San Diego County) was nearly four times that of Sonoma County, making the jury pool much larger. The court mentioned that the factors measured by the survey would change after a transfer because continued publicity would "drive knowledge and prejudgment up regardless of where the case is sent." Finally, the court stressed that the survey did not measure the "country atmosphere,"

the "networking," and the "personal involvement" in Sonoma County, none of which would be present in Santa Clara County. For these reasons, the court transferred the matter to Santa Clara County.

### 2. *Analysis*

Defendant claims the change of venue to Santa Clara County "amounted to no change of venue at all" and that the trial court abused its discretion by transferring the case there, instead of to Los Angeles County or San Diego County. He relies heavily on the results of the survey and the testimony of Professors Schoenthaler and Bronson to argue that the people of Santa Clara County were as prejudiced against him as those in Sonoma County. We disagree.

■ After a motion to change venue is granted, absent an agreement as to the new venue, the parties have a right to an evidentiary hearing to determine where the case should be transferred. (*People v. Stanley* (1995) 10 Cal.4th 764, 790–791 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *People v. Cooper* (1991) 53 Cal.3d 771, 804 [281 Cal.Rptr. 90, 809 P.2d 865]; *McGown v. Superior Court* (1977) 75 Cal.App.3d 648, 652 [142 Cal.Rptr. 262].) "The presence or absence of prejudicial publicity in [a successor county] is one of many facts and circumstances which should be considered by [a] court in the exercise of its discretion to decide where the cause should be transferred." (*McGown, supra*, 75 Cal.App.3d at p. 653.) Even if the magnitude of pretrial publicity in a successor county may not otherwise merit a change of venue from that county, it may still be large enough to persuade a court not to transfer the case to that county. (*People v. Cooper, supra*, 53 Cal.3d at p. 804; *McGown, supra*, 75 Cal.App.3d at p. 653.) In addition, we have previously held that, even in capital cases, "considerations of relative hardship, and the conservation of judicial resources and public funds, are important factors in deciding between various possible venue sites." (*Cooper, supra*, 53 Cal.3d at p. 805.) This may include choosing a new venue site near the original venue site for the convenience of witnesses, attorneys, and interested residents of the original venue site. (*Ibid.*) After hearing any evidence, the court must make a decision in "the interest of justice" in choosing where the case should be transferred, and we review that decision for an abuse of discretion. (*Id.* at pp. 804–805; *McGown, supra*, 75 Cal.App.3d at pp. 653–654.)

Of the four candidate counties in this case, Santa Clara, in virtually every model presented by all three experts, had a level of knowledge and prejudgment of guilt and sentence significantly higher than those found in Los Angeles County or San Diego County. But the media attention remained pervasive throughout the state, including the four candidate counties, even though the crime had occurred two years before the hearing. As a result, the

trial court could reasonably conclude that, regardless of where the case would be tried, media attention would shift to the new venue. As in *People v. Manson* (1976) 61 Cal.App.3d 102 [132 Cal.Rptr. 265], another high-profile case, media coverage of defendant's crimes "permeated every corner of this state with varying degrees of intensity," and, despite relocating the case to a different venue, "nothing could have prevented the public media from swinging its attention to that place" because "[t]he magnetic pull of such notorious cases is compelling." (*Id.* at p. 177; see also *Irvin v. Dowd* (1961) 366 U.S. 717 [6 L.Ed.2d 751, 81 S.Ct. 1639]; Note, *Prejudicial Publicity in Trials of Public Officials* (1975) 85 Yale L.J. 123, fn. 2.)

Consequently, because all three experts agreed (and the surveys confirmed) that the more knowledge a person had about this case, the more likely that person would judge defendant guilty, it was reasonable to assume that a transfer to either Los Angeles County or San Diego County would cause the jury pools in those venues to experience an increase in knowledge and prejudgment rates, perhaps reaching rates similar to those in Santa Clara County.

■ This did not necessarily mean, however, that defendant had no fair or impartial venue available to him or that moving the case out of Sonoma County was a useless gesture. We have never required potential jurors to be ignorant of news accounts of the crime or free of " 'any preconceived notion as to the guilt or innocence of an accused.' " (*People v. Harris* (1981) 28 Cal.3d 935, 950 [171 Cal.Rptr. 679, 623 P.2d 240], quoting *Irvin v. Dowd, supra*, 366 U.S. at p. 723; see also *People v. Riggs* (2008) 44 Cal.4th 248, 281 [79 Cal.Rptr.3d 648, 187 P.3d 363]; *In re Hamilton* (1999) 20 Cal.4th 273, 295 [84 Cal.Rptr.2d 403, 975 P.2d 600].) The mere presence of such awareness on the jurors' part, without more, does not presumptively deny a defendant due process, because to hold otherwise " 'would be to establish an impossible standard.' " (*People v. Harris, supra*, 28 Cal.3d at pp. 949–950, quoting *Irvin v. Dowd, supra*, 366 U.S. at p. 723.) In the absence of some reason to believe otherwise, it is only necessary that a potential juror be willing to set aside his or her " 'impression or opinion and render a verdict based on the evidence presented in court.' " (*Harris*, at p. 950, quoting *Irvin v. Dowd*, at p. 723; see *People v. Riggs, supra*, 44 Cal.4th at p. 281.)

Because it is impossible to control heightened media attention in any new venue, it also is virtually impossible to prevent the knowledge and prejudgment rates for potential jurors living in a new venue from increasing after the change of venue has occurred. Thus, when evaluating a county under consideration as the site for the trial of a high-publicity case, the ability of potential jurors in that county to disregard the information they have learned from the media, and to set aside opinions they have formed based on that

information, is significant, because it bears on the likelihood that the defendant will be able to receive a fair trial there.

The survey in this case showed that the ability of persons to set aside their opinion of defendant's guilt was not dramatically different between Santa Clara County (58 percent), Los Angeles County (63 percent), and San Diego County (67 percent), especially when compared to Sonoma County (46 percent). But the survey did not explain why Sonoma County differed so significantly from the candidate counties in the ability of potential jurors to set aside their opinions. The Sonoma trial court identified the problem as being Sonoma County's "personal involvement" in the case. Defendant argues that "personal involvement" is an "intangible" based on "intuition" and that no evidence in the record reliably supported this factor or showed that it would be absent in Santa Clara County. We disagree.

The 598 Sonoma County questionnaires paint a picture of a growing county suddenly exposed to a crime that jolted many of its residents out of their smalltown sense of security and peace. When asked whether the crime affected their lives, 72 percent of the Sonoma County prospective jurors responded affirmatively, with many expressing shock over the nature of the kidnapping and sorrow over the young girl's death. One wrote: "It saddened me to know that this type of crime can happen in my home town." Another explained: "Because I also come from a small town and not far away from Miss Klaas' home town, I felt like someone I knew had been murdered. . . ." Another wrote: "A sense of general anguish and pain spread through the entire community." At least two prospective Sonoma jurors cried while filling out their questionnaires.

Not only did many prospective Sonoma County jurors indicate they cried or felt sorrow when they learned that Polly was dead, 23 percent took steps to improve the security around their homes, such as locking their doors and windows. As one prospective juror put it: "It has become unsafe. We used to leave our doors unlocked and didn't have to fear for our lives." Another wrote: "It took from us our last safe place, our own homes." Yet another observed: "I feel that we have lost the trusting way that we once enjoyed. It has made us a suspicious and untrusting society." Thirty-nine percent either listened to the broadcast of the memorial services for Polly or personally attended the services, and dozens indicated that they cried while watching the service.

Over 14 percent of the 598 prospective Sonoma County jurors said they knew one of three victims or the victims' family members or one of the potential witnesses or attorneys associated with the case. Nearly 12 percent of those jurors either participated in the search for Polly Klaas or volunteered or

contributed money to the Polly Klaas Foundation. According to a prospective juror who mailed fliers during the search: "Everyone seemed 'closer,' she became like part of the family." This emotional involvement continued after Polly's death became known, with 11 percent of the 598 prospective Sonoma County jurors indicating that they personally visited the site where her body was recovered.

If the 598 prospective Sonoma County jurors' social networks are included, 23 percent of the prospective jurors' family members, friends, or coworkers participated in the search; volunteered or contributed to the Polly Klaas Foundation; knew the victims, the victims' families, a potential witness, or an attorney associated with the case; or visited the site where Polly's body was found.

As a measure of the total personal and community involvement in this case, if we include any prospective juror who met at least one of the above criteria, some 500 of the 598 prospective jurors (84 percent) in Sonoma County had some kind of personal or community involvement in this case.

Therefore, contrary to defendant's argument on appeal, the "personal involvement" factor was not merely rooted in the trial court's "intuition"; it was overwhelmingly evident from the record of the failed Sonoma County jury selection. Given the unique circumstances faced in Sonoma County, the trial court there reasonably concluded that a more urban county would not experience a similar "small town" reaction or connection to the crime (see *Martinez v. Superior Court* (1981) 29 Cal.3d 574, 581 [174 Cal.Rptr. 701, 629 P.2d 502]), and, as we will explain in defendant's second claim, a review of the Santa Clara County jury selection confirms this conclusion. "In counties geographically removed from the locale of the crime, lack of a sense of community involvement will permit jurors a degree of objectivity unattainable in that locale." (*Corona v. Superior Court* (1972) 24 Cal.App.3d 872, 883 [101 Cal.Rptr. 411]; see also *Powell v. Superior Court* (1991) 232 Cal.App.3d 785, 802 [283 Cal.Rptr. 777].) In addition, "[l]ocal consciousness of the community's reputation for peace and security will be eliminated." (*Corona, supra,* 24 Cal.App.3d at p. 883.)

For these reasons, the trial court did not abuse its discretion in transferring defendant's case to Santa Clara County. The court reasonably concluded that the "personal involvement" factor, not pretrial publicity by itself, was why jury selection had failed in Sonoma County, and that this factor was unique to Sonoma County and would not be present in any of the four candidate counties. The differences in knowledge and prejudgment rates among the candidate counties were not decisive because the media would descend on any new venue site and effectively "equalize" these rates. This equalization made it reasonable to consider costs and convenience as the primary differentiating factors in choosing a new venue. As a result, the court acted within its

discretion in selecting Santa Clara County, which, because of its proximity to the crime scene, was the most convenient and least expensive of the four counties for the trial in this case.

### B. *Change of Venue Motions Brought in Santa Clara County*

After the case was transferred to Santa Clara County and before jury selection, defendant moved for a second change of venue, but the trial court denied the motion and it denied a renewed motion near the end of jury selection. Defendant challenges these rulings.

A change of venue must be granted when the defendant shows "there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033, subd. (a).) In deciding an initial motion to change venue, the trial court considers such factors as the nature and gravity of the offense, the size of the community, the status of the defendant, the popularity and prominence of the victim, and the nature and extent of the publicity. (*People v. Ramirez* (2006) 39 Cal.4th 398, 434 [46 Cal.Rptr.3d 677, 139 P.3d 64].) The same factors apply to a motion for a second change of venue, except that "the fact that venue has already been changed once affects the analysis." (*People v. Cooper, supra*, 53 Cal.3d at p. 805; see *People v. Gallego* (1990) 52 Cal.3d 115, 167 [276 Cal.Rptr. 679, 802 P.2d 169].)

On appeal, a defendant challenging a trial court's denial of a motion for change of venue must show both error and prejudice: that is, that at the time of the motion it was reasonably likely that a fair trial could not be had in the county, and that it was reasonably likely that a fair trial was not had. (*People v. Lewis* (2008) 43 Cal.4th 415, 447 [75 Cal.Rptr.3d 588, 181 P.3d 947]; *People v. Williams* (1989) 48 Cal.3d 1112, 1126 [259 Cal.Rptr. 473, 774 P.2d 146]; *People v. Cooper, supra*, 53 Cal.3d at pp. 805–806.) We independently review the trial court's decision to deny the change of venue motion. (*People v. Cooper, supra*, at p. 806.)

With respect to the first factor, the nature and gravity of the offense, the kidnapping and murder of a young child and the false imprisonment of her friends are extremely serious offenses, but this factor alone does not compel a change of venue. "Prospective jurors would sympathize with the girls' fate" no matter where the trial was held, and this sympathy stems from the nature of the crime, "not the locale of trial." (*People v. Edwards* (1991) 54 Cal.3d 787, 808 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

As to the nature and extent of the media coverage, it is undisputed that Santa Clara County was inundated with press coverage of the case after the matter was transferred there. But this was both unsurprising and unavoidable,

given the attention the case received from the state and national press, and would have occurred in any county to which the case was transferred. Consequently, a change of venue "offered no solution to the publicity problem." (*People v. Manson, supra*, 61 Cal.App.3d at p. 177.)

To support his claim of an unduly prejudicial atmosphere in Santa Clara County, defendant emphasizes that, just before jury selection in that county, a "source" who was "close to the case" leaked details of defendant's case to a local television news station. But, as he concedes, such a leak could have occurred at any venue site. More importantly, defendant has not shown prejudice from the leaked information, as those details were admitted at trial.

As to the size of the community, at the time of the trial Santa Clara County had more than 1.6 million residents and was the fifth most populous county in California. Therefore, even assuming that the county's residents were deluged with press coverage, the size of Santa Clara County's population suggests there was a reasonable likelihood of finding jurors who had relatively little knowledge of the case or who knew of the case but did not have fixed opinions. (*People v. Dennis* (1998) 17 Cal.4th 468, 523 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) Indeed, over a three-week period, the trial court was able to select 82 prospective jurors who were not disqualified for cause.

Neither defendant nor victim Polly Klaas was a prominent member of the Santa Clara community. While Polly became well known after her death, she had no significant connection to Santa Clara County, unlike the county of her residence, Sonoma County. Defendant argues that, because both counties belonged to the same "media pool," prospective jurors in Santa Clara County exhibited the same kind of personal and community involvement as prospective jurors did in Sonoma County. The record refutes this argument.

The 330 Santa Clara County jury questionnaires indicate a level of personal and community involvement far below that of Sonoma County. Only 26 percent of the prospective jurors in Santa Clara County said the case had affected their lives, far less than the 72 percent who were affected in Sonoma County. Only 2 percent had improved the security around their homes as a result of the crime, a rate 10 times less than that of Sonoma County. Only 3 percent participated in the search for Polly, volunteered for the Polly Klaas Foundation, or gave money to the foundation, a rate nearly four times less than that of Sonoma County. The rate at which prospective Santa Clara County jurors knew one of the victims, the victims' families, a potential witness, or an attorney involved in the case was nine times less (1.5 percent) than that of Sonoma County (14 percent). The rate they listened to Polly's memorial service was three times less (12 percent) than that of Sonoma County (39 percent). The rate at which the prospective Santa Clara County

jurors personally visited any of the crime scenes was five times less than that of Sonoma County. Among them, the social networking involving this case was over 12 times less than that of Sonoma County: Only 2 percent of the prospective jurors' family members, friends, or coworkers participated in the search; volunteered for, or gave money to, the Polly Klaas Foundation; knew the victims, the victims' families, a potential witness, or an attorney associated with the case; or visited the site where Polly's body was found.

Finally, as a measure of the total personal and community involvement in this case, if we include any prospective juror who met at least one of the above criteria, 35 percent of the prospective jurors in Santa Clara County had some kind of personal or community involvement in this case, a rate far less than that of Sonoma County (84 percent). Significantly, the feelings of loss of the community's peace and security, so prevalent in Sonoma County, were virtually absent in the Santa Clara County questionnaires, which reflected the kind of sympathy one would expect in any venue for the murder of a young child (see *People v. Dennis, supra*, 17 Cal.4th at p. 523), but not the heightened sense of loss that permeated the Sonoma County questionnaires.

As evidence that he suffered prejudice, defendant claims that some of the 12 jurors selected for his trial exhibited the same kind of "personal involvement" found in Sonoma County, the original venue. We disagree.

Defendant points out that only one of the 12 jurors, Juror No. 10, who was living in Texas when the crimes in this case occurred, knew relatively little about the case, but even she was aware of the crimes and the names involved because of "national coverage." As discussed earlier, it would be an " 'impossible standard' " to require empanelment of a jury untouched by pretrial publicity. (*People v. Harris, supra*, 28 Cal.3d at pp. 949–950, quoting *Irvin v. Dowd, supra*, 366 U.S. at p. 723.)

Although several jurors expressed sadness over Polly's death and the nature of the crime, these expressions were not unusual as "[p]rospective jurors would have reason to sympathize with the victims and their families wherever the case was tried." (*People v. Pride* (1992) 3 Cal.4th 195, 225 [10 Cal.Rptr.2d 636, 833 P.2d 643].) That one of these jurors, a bar owner, allowed a patron to put up Polly's missing poster at the bar is hardly evidence of the kind of community involvement that was present in Sonoma County, the original venue.

Defendant contends that most of the 12 impaneled jurors expressed, in either their questionnaires or on voir dire, prejudgment of defendant's guilt. For example, Juror No. 1, whom the defense unsuccessfully challenged for cause, wrote in his questionnaire that he thought defendant "is most likely

guilty as sin." During voir dire, however, Juror No. 1 explained that his written answer was flippant because he was "anxious about the length of the trial" and that he would try to set aside his preconceived notions, be impartial, and follow the law. In denying the challenge for cause, the trial court found him sincere, honest, and objective. Although a juror's declaration of impartiality is not conclusive and we are not bound by the trial court's findings, we give great weight to a trial judge's finding of fairness. (*People v. Cooper, supra*, 53 Cal.3d at p. 807.) Moreover, as we discuss in greater detail below, defendant failed to exercise a peremptory challenge against this juror.

The remaining jurors who expressed some preconceived notions of defendant's guilt said they could set aside their opinions and follow the law, and defendant challenged none of them. Moreover, in addition to not being challenged for cause by either party, all of these jurors expressed significant reservations about imposing the death penalty. Given that defendant conceded his guilt as to Polly's kidnapping and murder during the trial, the question of his punishment was the most critical contested issue in this case, and these jurors expressed views on capital punishment that the defense might well have regarded as favorable.

That defendant still had three unused peremptory challenges when the 12 impaneled jurors were seated is also significant. Unpersuasive is trial counsel's assertion that defendant was reserving these three challenges for "three people who are still out there" among the 42 remaining potential jurors "who could not give Mr. Davis a fair trial because they prejudged this case." (See *People v. Morris* (1991) 53 Cal.3d 152, 185–186 [279 Cal.Rptr. 720, 807 P.2d 949].) Even if the prosecution used one of its seven remaining peremptory challenges, the probability that one of defendant's three disfavored jurors would be called from the remaining 42 prospective jurors was low. Similarly, defendant did not use peremptory challenges to excuse any of the five alternate jurors selected. Because the existence of unused peremptory challenges strongly indicates defendant's recognition that the selected jury was fair and impartial, the failure of the defense to exhaust all peremptory challenges, without a reasonable explanation, can be a decisive factor, even in close cases, in confirming that the denial of a change of venue was justified. (*People v. Dennis, supra*, 17 Cal.4th at p. 524; *People v. Daniels* (1991) 52 Cal.3d 815, 853–854 [277 Cal.Rptr. 122, 802 P.2d 906].)

For the reasons given above, the trial court properly denied defendant's motions for a second change of venue, and the trial was properly held in Santa Clara County.

## C. Claims of Errors During Jury Selection

Defendant contends the trial court erroneously denied six of his challenges for cause during jury selection. None of these prospective jurors actually served on the jury, and the defense excused two of them by peremptory challenges.

Defendant's failure to exhaust his peremptory challenges or to express dissatisfaction with the jury as selected forfeits this claim on appeal. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 487 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Moreover, the claim fails on the merits for lack of prejudice: Because none of the prospective jurors in question served on the jury, "there is no basis for us to conclude that the jury empanelled was anything but impartial." (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1314 [63 Cal.Rptr.3d 433, 163 P.3d 118]; see also *People v. Hillhouse, supra,* 27 Cal.4th at pp. 487–488.)

Defendant faults the trial court for overruling his objection to the prosecution's use of peremptory challenges to exclude seven "people of color" (five Hispanic-surnamed jurors, one unidentified Chinese-American juror, and one unidentified African-American juror) and ruling that defendant had failed to make a prima facie showing that the prosecutor had challenged the Hispanic-surnamed jurors because of group bias.

■ Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity. (See *Batson v. Kentucky* (1986) 476 U.S. 79, 97 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).) When the defense raises such a challenge, these procedures apply: "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted; see also *People v. Lewis, supra,* 43 Cal.4th at p. 469.)

To make a prima facie showing of group bias, "the defendant must show that under the totality of the circumstances it is reasonable to infer discriminatory intent." (*People v. Kelly* (2007) 42 Cal.4th 763, 779 [68 Cal.Rptr.3d 531, 171 P.3d 548]; see also *People v. Bonilla* (2007) 41 Cal.4th 313, 341 [60 Cal.Rptr.3d 209, 160 P.3d 84].) When, as in this case, it is unclear whether

the trial court used the recently disapproved "strong likelihood" standard, rather than the correct "reasonable inference" standard, "we review the record independently to determine whether the record supports an inference that the prosecutor excused a juror on a prohibited discriminatory basis." (*People v. Kelly, supra*, 42 Cal.4th at p. 779.)

 "Though proof of a prima facie case may be made from any information in the record available to the trial court, we have mentioned 'certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.' " (*People v. Bell* (2007) 40 Cal.4th 582, 597 [54 Cal.Rptr.3d 453, 151 P.3d 292], quoting *Wheeler, supra*, 22 Cal.3d at pp. 280–281.)

The trial court concluded that "people of color" was not a cognizable group for *Wheeler* analysis, and instead focused on the Spanish-surnamed jurors as a cognizable group. Based on the court's recollection of the jury selection, it ruled that defendant had failed to establish a prima facie case that the prosecution's exercise of peremptory challenges was motivated by group bias.

At the outset, we reject defendant's contention that the trial court erred by ruling that "people of color" is not a cognizable group for *Wheeler* analysis. No California case has ever recognized "people of color" as a cognizable group. Even if such a group is cognizable, defendant has forfeited this claim, as he fails to identify on appeal the people of color whose excusals he challenged in the trial court, and we cannot discern their identity from the record. (*People v. Morris* (2003) 107 Cal.App.4th 402, 408–409 [131 Cal.Rptr.2d 872].) Accordingly, we will only review defendant's claim of *Wheeler/Batson* error based upon the prosecution's peremptory challenges of the five Hispanic-surnamed jurors.

Based on our independent review, we agree with the trial court that defendant did not make a prima facie case that the prosecutor challenged the five prospective jurors in question because they were Hispanic. Initially, we note that the defense did not contest the prosecutor's assertion that three of the five challenged jurors appeared "to be Caucasian with a possible Hispanic surname." Although we have held that Hispanic-surnamed jurors are a cognizable class for *Wheeler/Batson* purposes, even when "no one knows at the time of challenge whether a particular individual who has a Spanish surname is Hispanic . . ." (*People v. Trevino* (1985) 39 Cal.3d 667, 686 [217 Cal.Rptr. 652, 704 P.2d 719], disapproved on other grounds in *People v. Johnson* (1989) 47 Cal.3d 1194, 1219–1222 [255 Cal.Rptr. 569, 767 P.2d 1047]; see also *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1123 [124 Cal.Rptr.2d 373, 52 P.3d 572]), the prosecutor's unrefuted description of three of the prospective jurors in question as "Caucasian" weakens any inference of group bias that can be drawn from his exercise of peremptory challenges against them. (See generally *People v. Cruz* (2008) 44 Cal.4th 636, 655–657 [80 Cal.Rptr.3d 126, 187 P.3d 970] [prosecutor's challenge to White but Spanish-surnamed juror was not based on group bias].)

More significantly, there were obvious race-neutral grounds for the prosecutor's challenges to the prospective jurors in question. Prospective Jurors E.M. and F.C. voiced strong opposition towards the death penalty. (See *People v. Bolin* (1998) 18 Cal.4th 297, 317 [75 Cal.Rptr.2d 412, 956 P.2d 374] [the use of peremptory challenges "to excuse prospective jurors who expressed scruples about imposing the death penalty" is proper].) Prospective Juror L.F. also expressed scruples about imposing the death penalty by testifying that she would "favor the possibility of life imprisonment without the possibility of parole over the death penalty in a murder special circumstance case," and by writing in her juror questionnaire that she considered imprisonment for life a more severe penalty than death. Finally, Prospective Jurors D.P. and D.G. had criminal records. (See *People v. Roldan* (2005) 35 Cal.4th 646, 703 [27 Cal.Rptr.3d 360, 110 P.3d 289] [use of a peremptory challenge to excuse a prospective juror with negative experiences of the criminal justice system is proper].)

Therefore, the trial court properly ruled that defendant had not met his burden of raising an inference of discrimination, and it did not err in denying defendant's *Wheeler/Batson* motion.

### D. *Admissibility of Defendant's Confessions*

Defendant argues his custodial statements and confessions were obtained in violation of his rights under *Miranda v. Arizona, supra,* 384 U.S. 436. He contends that the introduction of this evidence, over his unsuccessful motion

to suppress, violated his rights to remain silent, to a fair trial, to reliable determinations of guilt and penalty, and to due process under the federal and state Constitutions. (U.S. Const., 5th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 13, 15–17.) Specifically, he asserts (1) the police failed to obtain a valid *Miranda* waiver at the outset of his first interrogation on November 30, 1993; (2) during that same interrogation, the police improperly continued to interrogate him after he invoked his right to counsel; (3) the police further violated his *Miranda* rights on December 4, 1993, when an officer questioned him in the morning and again during a later telephone call; (4) because of the prior *Miranda* violations, his later confessions should not have been admitted; and (5) the officers used deception to coerce involuntary statements from him during interrogations on the evening of December 4 and again two days later on December 6.

> 1. *Defendant's* Miranda *waiver at the beginning of the November 30, 1993, interrogation*

Defendant contends Petaluma Police Officer Pelton and FBI Agent Taylor violated his *Miranda* rights on November 30, 1993, by failing to obtain a valid waiver of his right to counsel at the beginning of the interrogation. Defendant relies on a *Miranda* waiver form, presented to him at the outset of the interrogation, in which the answer to question No. 4 is left blank: "Understanding that right [to talk to a lawyer], do you wish to talk to me now?" Defendant claims that he intentionally left the answer to that question blank, and that this conduct, combined with his hesitant oral responses to the question, show that he did not waive his right to counsel, thus tainting the entire interview as being obtained in violation of *Miranda.* We disagree.

■ Under *Miranda* and the long line of cases following it, a suspect cannot be subjected to custodial interrogation unless there has been a knowing and intelligent waiver of the rights to remain silent, to the presence of an attorney, and, if indigent, to the appointment of counsel; and "police interrogation must cease once the defendant, by words or conduct, demonstrates a desire to invoke his right to remain silent, or to consult with an attorney." (*People v. Johnson* (1993) 6 Cal.4th 1, 25–26 [23 Cal.Rptr.2d 593, 859 P.2d 673]; see also *Dickerson v. United States* (2000) 530 U.S. 428, 435–443 [147 L.Ed.2d 405, 120 S.Ct. 2326].)

■ No particular manner or form of *Miranda* waiver is required, and a waiver may be implied from a defendant's words and actions. (*North Carolina v. Butler* (1979) 441 U.S. 369, 373–375 [60 L.Ed.2d 286, 99 S.Ct. 1755]; *People v. Whitson* (1998) 17 Cal.4th 229, 246–250 [70 Cal.Rptr.2d 321, 949 P.2d 18].) In determining the validity of a *Miranda* waiver, courts look to whether it was free from coercion or deception, and whether it was " 'made

with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " (*People v. Whitson, supra*, 17 Cal.4th at p. 247, quoting *Moran v. Burbine* (1986) 475 U.S. 412, · 421 [89 L.Ed.2d 410, 106 S.Ct. 1135].) Both aspects are tested against the totality of circumstances in each case, keeping in mind the particular background, experience and conduct of the accused. (*North Carolina v. Butler, supra*, 441 U.S. at pp. 374–375.)

On review of a trial court's decision on a *Miranda* issue, we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*. (*People v. Johnson, supra*, 6 Cal.4th at p. 25.)

Here, the trial court did not err. The unedited video recording of the November 30 interrogation, which was played at the pretrial *Miranda* hearing, shows that it was Officer Pelton who, based on defendant's oral answers, filled in the blanks on the *Miranda* form; defendant, therefore, cannot claim that he was the one refusing to answer question No. 4. Additionally, the video recording shows that after defendant expressed some hesitation in agreeing to talk to the police without a lawyer, he reviewed the *Miranda* form, looked up at Officer Pelton and said "sure," asked where he needed to place his signature, and then signed the form where Officer Pelton had indicated. At worst, the officer inadvertently erred in failing to fill in the blank for question No. 4. We conclude that defendant gave an *unequivocal* waiver, and the blank for question No. 4 on defendant's written *Miranda* waiver form is inconsequential.

That defendant was no stranger to the criminal justice system and had fully waived his *Miranda* rights on previous occasions, including just six weeks earlier, when he was arrested on a drunk driving charge, reinforces our conclusion that his *Miranda* waiver at the beginning of the November 30, 1993, interrogation was voluntary, knowing, and intelligent.

### 2. *Defendant's invocation of his right to counsel during the November 30, 1993, interrogation*

Defendant asserts that his conduct near the end of the November 30, 1993, interrogation constituted an assertion of his right to counsel, and that therefore the continued questioning of him was improper. We disagree.

After defendant signed the *Miranda* waiver form, Petaluma Police Officer Pelton and FBI Agent Taylor initially asked him a series of routine questions regarding his whereabouts on October 1, 1993. After questioning him for

about an hour, Agent Taylor directly accused him of abducting Polly. When Officer Pelton began alluding to trace evidence and DNA evidence, defendant stood up and responded, "Well then book me and let's get a lawyer and let's go for it man, you know." Defendant said he did not mind answering the initial routine questions, but he resented being accused of Polly's abduction. He then remarked, "let's shit or get off the pot." When Agent Taylor interjected, "It's going to happen," defendant responded, "Well, let's go for it. That's the end, the end." When asked whether he still wanted to talk, defendant replied, "Get real. You think I should?" Officer Pelton answered, "That's up to you," to which defendant responded, "Fuck." Pelton and Taylor then asked why he had abducted Polly. Defendant sat down and replied: "I can't answer that question. Get real. I ain't done it, how can I answer it." He then stated, "I didn't kidnap that little fucking broad, man, get real."

Thereafter, defendant answered Officer Pelton's questions about why, earlier in the interrogation, defendant seemed to assume that Polly's kidnapping must have involved a sexual assault and he answered questions about whether he was under the influence on the night of the kidnapping. Defendant then remarked, "but as far as these questions are going. Get me a lawyer and let's go on down the road." When Officer Pelton said, "So you want a lawyer, you don't want to talk anymore?," defendant replied, "Hey, it's over and done now. Like I say shit or get off the pot, let's go." The officers then ended the interrogation.

Contrary to defendant's argument on appeal, "[t]he rule that interrogation must cease because the suspect requested counsel does not apply if the request is *equivocal*; '[r]ather, the suspect must *unambiguously* request counsel.' " (*People v. Sapp* (2003) 31 Cal.4th 240, 266 [2 Cal.Rptr.3d 554, 73 P.3d 433], italics added, quoting *Davis v. United States* (1994) 512 U.S. 452, 459 [129 L.Ed.2d 362, 114 S.Ct. 2350].)

After viewing the videotape of defendant's interrogation, the trial court concluded that defendant's first remark about getting an attorney was not an invocation of rights but "a challenge," commenting that defendant was using "as much technique as the people who were questioning him." The court ruled, however, that defendant invoked his *Miranda* rights when Officer Pelton asked, "So you want a lawyer, you don't want to talk anymore?," and defendant replied, "Hey, it's over and done now. Like I say shit or get off the pot, let's go." Defendant claims the court erred by not finding that the invocation occurred earlier, when he said, "Well then book me and let's get a lawyer and let's go for it man, you know."

Based on our review of the videotape of defendant's interrogation, we conclude that substantial evidence supports the trial court's ruling. Defendant made his initial statements about booking him for Polly's abduction, getting a lawyer, and telling the officers to "go for it" in response to Officer Pelton's comment about trace evidence linking him to the crime. The trial court reasonably concluded that at this point defendant was employing his own "technique" by standing up and issuing "a challenge" to his questioners: "[I]f you can prove it, go for it." When Officer Pelton tried to clarify whether defendant wished to continue to talk, defendant said, "let's shit or get off the pot." When asked again, defendant replied, "Get real. You think I should?" Officer Pelton responded, "That's up to you," to which defendant replied, "Fuck." Defendant then sat down, indicating his willingness to continue the interrogation.

■ Whether a suspect has invoked the right to counsel "is an objective inquiry." (*Davis v. United States, supra*, 512 U.S. at p. 459.) Here defendant's initial comments were not an *unambiguous* invocation of the right to "*immediate* presence of an attorney." (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1126 [23 Cal.Rptr.3d 295, 104 P.3d 98].)

In contrast, as the trial court correctly found, all ambiguity was dispelled later, when defendant blurted out, "get me a lawyer," and said he was "over and done" answering any questions. This was defendant's first clear invocation of his constitutional rights to counsel and to remain silent.

Even assuming that the trial court erred in not finding an earlier invocation of defendant's *Miranda* rights, any error is harmless beyond a reasonable doubt, as the portion of the interrogation at issue merely contained defendant's noninculpatory denials of his involvement in Polly's kidnapping. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 994 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

### 3. *Defendant's statements to Sergeant Meese on December 4, 1993*

Defendant argues that his statements to Petaluma Police Sergeant Meese on December 4, 1993, when he confessed to the murder of Polly Klaas, were admitted in violation of his *Miranda* rights because Sergeant Meese impermissibly elicited the confession four days after defendant had asserted those rights.

These are the pertinent facts:

Although defendant invoked his right to counsel toward the end of police questioning on November 30, 1993, no attorney was provided. Defendant

remained incarcerated on his parole violation warrant and on the October 19, 1993, drunk driving charge. On December 1, defendant, without an attorney, was placed in an in-person lineup and asked to read phrases said by Polly's kidnapper to Polly's two classmates who were with her in her bedroom on the night of the crimes. On December 2, defendant appeared without counsel in a Mendocino court and pled guilty to the drunk driving charge, waiving his right to remain silent and his right to an attorney for those proceedings.

From defendant's arrest through December 3, 1993, the police curtailed their searches for Polly and evidence of her abduction at the Pythian Road site where defendant's car had been stuck, instead focusing attention on defendant's sister's home, where defendant was arrested. During this period, defendant was housed in isolation and was moved from cell to cell.

On December 4, defendant was moved from an isolation cell to a medical isolation cell in the Mendocino County Jail because he was considered a suicide risk. The medical isolation cell, with 24-hour lighting, was surrounded by observation windows. About 9:30 that morning, William Marvin White, a friend and former employer, visited defendant and told him that a television report mentioned that defendant was a suspect in Polly's kidnapping and that his palm print had been lifted from Polly's bedroom. Defendant said he was being kept in isolation at the jail and had not watched any television.

As White's visit ended, Petaluma Police Sergeant Meese and FBI Agent Taylor arrived at the jail to roll defendant's hands for fingerprints and palm prints. According to Meese, he did not intend to obtain a confession from defendant but was simply trying to discover Polly's whereabouts because there was "reason to believe she was still alive."

After obtaining prints of defendant's fingers and palms, Sergeant Meese told defendant that if there was "any hope" that Polly was alive, defendant "ought to give thought to talking to" him. Defendant replied he did not know what Meese was talking about. Meese told defendant the police had "enough physical evidence to make the case" even without a statement from defendant, and that if defendant decided he wanted to talk he could give Meese "a call." Meese then departed for the Pythian Road crime scene, leaving his pager number with a corrections officer. After Meese's departure, defendant (according to the testimony of a corrections officer at the jail) became very quiet, reserved, and "stone-faced," looking at the ground.

About 15 minutes after Sergeant Meese's departure, defendant told a corrections officer he wanted to talk to Meese. A corrections officer notified Meese, who decided not to speak to defendant on his cellular phone for fear

that the call would be intercepted by the news media. Two hours later, Meese called the jail from a pay telephone and spoke to defendant, who said, "I fucked up big time." When Meese asked if Polly was still alive, defendant said she was not. In response to Meese's question whether Polly's body was near the ditch off Pythian Road, defendant said it was not. Defendant then asked for protective custody and a pack of cigarettes. He also asked whether he could plead guilty in exchange for a sentence of life without parole. That, Meese replied, was a matter for the district attorney. Defendant said that when Meese returned to the jail, defendant would show him the location of Polly's body. When Meese asked if he could bring FBI Agent Taylor with him, defendant said he could.

That afternoon, Sergeant Meese and FBI Agent Taylor returned to the jail, where defendant waived his *Miranda* rights and made videotaped statements for the next two hours. In the evening, defendant led Meese and Taylor to Polly's body, and their conversations during that trip were tape-recorded. Later that night, defendant again waived his *Miranda* rights and made additional videotaped statements.

The trial court denied defendant's motion to suppress the December 4, 1993, telephone conversation in which he told Sergeant Meese that Polly was dead. On appeal, defendant argues that suppression was required under the United States Supreme Court's decision in *Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] (*Edwards*). There, the high court said that if, at any point during custodial interrogation, a suspect requests counsel, " 'the interrogation must cease until an attorney is present.' " (*Edwards, supra,* 451 U.S. at p. 482, quoting *Miranda, supra,* 384 U.S. at p. 474.)

In a later case, the United States Supreme Court explained: "Once a suspect asserts the right [to counsel], not only must the current interrogation cease, but he may not be approached for further interrogation 'until counsel has been made available to him . . .' . . . . If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights,' [citation]." (*McNeil v. Wisconsin* (1991) 501 U.S. 171, 176–177 [115 L.Ed.2d 158, 111 S.Ct. 2204], citation omitted; see also *People v. Cunningham, supra,* 25 Cal.4th at pp. 992–993; *People v. Crittenden* (1994) 9 Cal.4th 83, 128 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

Here, four days after defendant had invoked his right to counsel, Sergeant Meese reinitiated contact with defendant and, without providing him with counsel, tried to persuade him to disclose where Polly was. Defendant characterizes that conduct as illegal, thus requiring suppression of the December 4, 1993, telephone conversation and the statements defendant made thereafter. But, as the trial court ruled, the challenged telephone statements were admissible under the "rescue doctrine." (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 56 [17 Cal.Rptr.3d 710, 96 P.3d 30] (*Coffman and Marlow*).)

The origins of the rescue doctrine can be traced to our decision in *People v. Modesto* (1965) 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753] (*Modesto*), which antedated by some 16 months the high court's decision in *Miranda, supra,* 384 U.S. 436. In *Modesto,* the defendant broke into a residence and bludgeoned a nine-year-old girl, killing her, and he kidnapped the victim's 12-year-old sister, Connie. Hours later, the police interrogated the defendant without advising him of his rights to remain silent and to the assistance of counsel, suggesting to him that Connie might still be alive and could be saved. The defendant directed them to a storm drain where Connie's body was found farther downstream. She had drowned. We held that the statements defendant made during the interrogation were admissible, explaining: "They were freely and voluntarily made at a time when the officers were concerned primarily with the possibility of saving Connie's life. The paramount interest in saving her life, if possible, clearly justified the officers in not impeding their rescue efforts by informing defendant of his rights to remain silent and to the assistance of counsel." (*Modesto, supra,* 62 Cal.2d at p. 446.)

Shortly thereafter, in *People v. Jacobson* (1965) 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555], we applied the *Modesto* holding, and we did so again in *People v. Miller* (1969) 71 Cal.2d 459, 481–482 [78 Cal.Rptr. 449, 455 P.2d 377], upholding statements obtained by investigating police officers through routine on-the-scene questioning of noncustodial suspects as to facts surrounding a report of a dead or missing child. Later, the Court of Appeal in *People v. Dean* (1974) 39 Cal.App.3d 875 [114 Cal.Rptr. 555] first coined the phrase "rescue doctrine" to describe our holding in *Modesto, supra,* 62 Cal.2d 436; in rejecting the defendant's argument in *Dean* that the doctrine was no longer viable in light of the high court's decision in *Miranda, supra,* 384 U.S. 436, the Court of Appeal pointed out that "[w]hile life hangs in the balance, there is no room to require admonitions concerning the right to counsel and to remain silent." (*Dean, supra,* 39 Cal.App.3d at p. 882.)

Four years later, the Court of Appeal in *People v. Riddle* (1978) 83 Cal.App.3d 563 [148 Cal.Rptr. 170] (*Riddle*), a kidnapping case, articulated a three-part test to determine applicability of the rescue doctrine: "1. Urgency

of need in that no other course of action promises relief; [¶] 2. The possibility of saving human life by rescuing a person whose life is in danger; [and] [¶] 3. Rescue as the primary purpose and motive of the interrogators." (*Riddle, supra,* 83 Cal.App.3d at p. 576.) Some two years later, the Court of Appeal in *People v. Willis* (1980) 104 Cal.App.3d 433 [163 Cal.Rptr. 718], applying the *Riddle* test, held to be admissible the defendant's statements obtained during an interrogation that, as in this case, occurred after the defendant's invocation of his *Miranda* rights. (*Willis,* at p. 449; but see *People v. Laliberte* (1993) 246 Ill.App.3d 159, 171–172 [186 Ill.Dec. 9, 615 N.E.2d 813] [refusing to apply the rescue doctrine when a suspect invokes the right to counsel]; *State v. Miller* (1985) 300 Ore. 203 [709 P.2d 225, 241] [same].)

After the California courts had adopted the rescue doctrine, the high court in *New York v. Quarles* (1984) 467 U.S. 649 [81 L.Ed.2d 550, 104 S.Ct. 2626] (*Quarles*) carved out a "public safety" exception to the requisite *Miranda* warnings. In *Quarles,* the victim approached police officers on patrol, told them she had just been raped, described the assailant, and said he was in a nearby store with a gun. An officer entered the store, saw the defendant, and arrested him. Noticing the defendant's empty shoulder holster, the officer asked the defendant where the gun was, and the defendant told him its location. After retrieving the gun, the officers advised the defendant of his constitutional rights under *Miranda.* The high court held that the officer's initial question to the defendant did not violate *Miranda* because of "a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence." (*Quarles, supra,* 467 U.S. at p. 655.) *Quarles* held that "the availability of that exception does not depend upon the motivation of the individual officers involved." (*Id.* at p. 656.)

*Quarles* explained that the officers in that case were faced with a "kaleidoscopic situation" (*Quarles, supra,* 467 U.S. at p. 656) in which "spontaneity rather than adherence to a police manual [was] necessarily the order of the day" (*ibid.*) and the defendant's gun "obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it" (*id.* at p. 657). An officer should not be placed in the "untenable position," the court reasoned, of having to decide, "often in a matter of seconds," whether to confront "the volatile situation" by either seeking an un-*Mirandized* statement, thereby rendering the evidence inadmissible, or giving the requisite *Miranda* warnings, which might render any answer admissible but also might deter the suspect from making any statement in the first place. (*Quarles, supra,* 467 U.S. at pp. 657–658.) "[T]he need for answers to questions in a situation posing a threat to the public safety," the court held, "outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." (*Id.* at p. 657.)

 Defendant here argues that the rescue doctrine is not a separate exception to the *Miranda/Edwards* rules but is subsumed within the public safety exception articulated by the high court in *Quarles, supra,* 467 U.S. 649. This court, however, has described the rescue doctrine as "analogous" to, not subsumed within, the public safety exception. (*Coffman and Marlow, supra,* 34 Cal.4th at p. 56.) In the handful of post-*Quarles* cases involving the rescue of missing persons, California decisions have continued to apply the rescue doctrine independently of the public safety exception articulated by the high court. (See *People v. Panah* (2005) 35 Cal.4th 395, 471 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *Coffman and Marlow, supra,* 34 Cal.4th at p. 56; *People v. Stevenson* (1996) 51 Cal.App.4th 1234, 1239–1240 [59 Cal.Rptr.2d 878].)

Here, in admitting defendant's statements, the trial court relied in part on its conclusion that when Petaluma Police Sergeant Meese asked defendant to tell him where Polly was, Meese was motivated by the desire to save Polly's life. Reliance on Sergeant Meese's motivation was consistent with the test set forth in the Court of Appeal's decision in *Riddle,* the third prong of which, as previously mentioned, considers whether rescue is "the primary purpose and motive of the interrogators." (*Riddle, supra,* 83 Cal.App.3d at p. 576.) But this court has never adopted the *Riddle* test in determining applicability of the rescue doctrine. And that test's consideration of the motivation of the interrogating officer has been undermined by the high court's statement in *Quarles* (decided after *Riddle*), that the applicability of the public safety exception, which is analogous to the rescue doctrine, "does not depend upon the motivation of the individual officers involved." (*Quarles, supra,* 467 U.S. at p. 656.) A subjective test, the high court noted in *Quarles,* would be problematic because different police officers in similar situations may act out of "a host of different . . . and largely unverifiable motives" (*ibid.*), and the legality of their conduct "should not be made to depend on *post hoc* findings at a suppression hearing concerning the subjective motivation of the arresting officer" (*ibid.*). In determining the applicability of the *Miranda* rule, the high court has generally frowned on the use of subjective tests. (See *People v. Peevy* (1998) 17 Cal.4th 1184, 1199 [73 Cal.Rptr.2d 865, 953 P.2d 1212] [citing decisions of the U.S. Supreme Court demonstrating that "applications of the *Miranda* rule generally do not turn upon the individual officer's subjective state of mind . . ."].)

 For these reasons, applicability of the rescue doctrine must be grounded on objective facts known to law enforcement. " '[U]nder circumstances of extreme emergency where the possibility of saving the life of a missing victim exists, noncoercive questions may be asked of a material witness in custody even though answers to the questions may incriminate the

witness. Any other policy would reflect indifference to human life.' "[4] (*Coffman and Marlow, supra,* 34 Cal.4th at p. 56, quoting *Riddle, supra,* 83 Cal.App.3d at p. 578.)

Defendant insists that no such emergency existed here. He contends it was unreasonable to believe that Polly was still alive when Sergeant Meese questioned him because at that time Polly had been missing for 64 days, or just over nine weeks. (See *People v. Manning* (Colo. 1983) 672 P.2d 499, 502, 511–512 [refusing to apply the rescue doctrine because the three-year-old victim, who had been severely beaten before disappearing, had been missing for 14 weeks and the lead investigator had begun to search for the child's dead body].) Defendant points out that in all California cases that have applied the rescue doctrine the victim had been missing for a far shorter time than here. (See *Coffman and Marlow, supra,* 34 Cal.4th 1, 57 [victim missing for seven days]; *People v. Willis, supra,* 104 Cal.App.3d 433 [victim missing for several days]; *Riddle, supra,* 83 Cal.App.3d 563 [the defendant was questioned over a two-day period shortly after the victim disappeared]; *People v. Dean, supra,* 39 Cal.App.3d 875 [victim missing for three days]; see also *People v. Swoboda* (N.Y.Crim.Ct. 2002) 190 Misc.2d 214 [737 N.Y.S.2d 821, 827] [victim missing for 11 days].)

But the length of time a kidnap victim has been missing is not, by itself, dispositive of whether a rescue is still reasonably possible. Although "it is sadly true" that not all kidnap victims are recovered alive, "this does not compel the conclusion" that the possibility of rescue is unreasonable. (*People v. Dean, supra,* 39 Cal.App.3d at p. 883.) Several published decisions describe kidnappings in which the victim was found alive after being held captive for periods longer than 64 days. (See, e.g., *Parnell v. Superior Court* (1981) 119 Cal.App.3d 392 [173 Cal.Rptr. 906] [seven-year-old boy kidnapped and held captive for over seven years]; *In re Marriage of Weintraub* (1985) 167 Cal.App.3d 420 [213 Cal.Rptr. 159] [adult female abducted and forced to marry her captor, who held her captive for 67 days]; *People v. Rios* (1986) 177 Cal.App.3d 445 [222 Cal.Rptr. 913] [one-year-old infant abducted and found living with surrogate parents four years later]; *U.S. v. Hearst* (9th Cir. 1977) 563 F.2d 1331 [19-year-old woman, kidnapped by guerilla group, joined her captors for 18 months].)

Here, even though Polly had been missing for 64 days, it was objectively reasonable for Sergeant Meese to believe that defendant might

---

[4] We disapprove the Court of Appeal's decision in *People v. Riddle, supra,* 83 Cal.App.3d 563, 576–578, and cases following it (*People v. Stevenson, supra,* 51 Cal.App.4th 1234, 1238–1239; *People v. McDermand* (1984) 162 Cal.App.3d 770, 796–797 [211 Cal.Rptr. 773]; *People v. Willis, supra,* 104 Cal.App.3d 433, 449) to the extent that those decisions apply *Riddle*'s three-part test in determining applicability of the rescue doctrine.

have information that could lead to her rescue. When defendant abducted Polly, he told the two friends that were with Polly in her bedroom that he would not touch her and that "he was only doing this for the money," implying that he was kidnapping Polly for ransom, not for murder. Moreover, none of the evidence recovered from the Pythian Road site (where defendant's car had become stuck in a ditch on the night Polly was kidnapped and which the police examined on Nov. 28, 1993), or from defendant's car (which the police seized when they arrested defendant on Nov. 30, 1993), indicated that Polly was dead.

Defendant contends that it was objectively unreasonable for the police to wait four days after defendant had invoked the right to counsel before asking him where Polly was, and that this delay undercut the existence of any exigency. He relies on a District of Columbia decision holding that a delay in questioning can be unreasonable for purposes of the public safety exception that the high court articulated in *Quarles, supra,* 467 U.S. 649. (*Trice v. U.S.* (D.C. 1995) 662 A.2d 891 (*Trice*); see also Note, *The Public Safety Exception to* Miranda: *Analyzing Subjective Motivation* (1995) 93 Mich. L.Rev. 2377, 2390 ["[A]n appreciable delay before questioning about the alleged danger indicates that investigatory considerations, rather than an immediate danger, motivated the officer. . . . [C]ourts widely consider an officer's immediate questioning as an objective factor that supports applying the *Quarles* exception."].) In *Trice,* the federal appeals court applied the *Quarles* public safety exception in a situation where the police officer asked the suspect about the location of a missing shotgun well after his arrest and transport to the police station. *Trice* noted, however: "[W]e do not suggest that the exception remains available indefinitely simply because a missing weapon has not been located; if the police, after becoming aware of a threat to public safety, delay questioning the suspect about that threat for an unreasonable period of time, a court no longer may be able to conclude that the question was prompted by a concern for public safety rather than for factual investigation." (*Trice, supra,* 662 A.2d at pp. 896–897.) *Trice* is distinguishable from this case, because it involved a search for a missing weapon, not (as in this case) a missing child.

Here, the police and the FBI continued to try to locate the kidnapped Polly during the four days after defendant had invoked his right to counsel and made no statements regarding Polly's whereabouts. But that search proved fruitless. Defendant was law enforcement's best hope to gain vital information about Polly, who had been missing for over two months after defendant had kidnapped her: Where was she? Was she still alive? The questions posed to defendant on the morning of December 4, 1993, were specifically aimed at getting answers to those questions. So long as she remained missing, her safety was of paramount importance. Under these extraordinary circumstances, Sergeant Meese's inquiry did not violate the high court's decisions in *Miranda, supra,* 384 U.S. 436, and *Edwards, supra,* 451 U.S. 477. And,

contrary to defendant's contention in his petition for rehearing, nothing in the United States Supreme Court's recent decision in *Montejo v. Louisiana* (2009) 556 U.S. ___ [173 L.Ed.2d 955, 129 S.Ct. 2079] compels a different conclusion. Therefore, the trial court properly denied defendant's motion to suppress his December 4, 1993, statements to Sergeant Meese that same morning and thereafter over the telephone, when he said that Polly was dead and that he would lead the police to her body.

As mentioned earlier, after defendant's telephone conversation with Sergeant Meese, the latter and FBI Agent Taylor went back to the jail, where defendant waived his *Miranda* rights and made statements for the next two hours. In the evening, defendant led Meese and Taylor to Polly's body. Later that night, defendant again waived his *Miranda* rights and made additional statements. For purposes of our analysis, however, we need not determine the precise moment when Polly's rescue was no longer a realistic possibility because, as we explain below, the trial court correctly denied defendant's motion to suppress his statements at issue.

■ After a suspect has invoked the right to counsel, police officers may nonetheless resume their interrogation if "the suspect '(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.' " (*Connecticut v. Barrett* (1987) 479 U.S. 523, 527 [93 L.Ed.2d 920, 107 S.Ct. 828]; see also *Smith v. Illinois* (1984) 469 U.S. 91, 95 [83 L.Ed.2d 488, 105 S.Ct. 490]; *Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1044 [77 L.Ed.2d 405, 103 S.Ct. 2830] (*Bradshaw*).) The waiver must be " 'knowing and intelligent . . . under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' " (*Bradshaw, supra*, at p. 1046, quoting *Edwards, supra*, 451 U.S. at p. 486, fn. 9.) The trial court must take into account " ' "the particular facts and circumstances surrounding [the] case, including the [suspect's] background, experience, and conduct." ' " (*Bradshaw, supra*, at p. 1046, quoting *North Carolina v. Butler, supra*, 441 U.S. at pp. 374–375; see also *People v. San Nicolas* (2004) 34 Cal.4th 614, 642–643 [21 Cal.Rptr.3d 612, 101 P.3d 509]; *People v. Mickey* (1991) 54 Cal.3d 612, 648–653 [286 Cal.Rptr. 801, 818 P.2d 84]; *People v. Thompson* (1990) 50 Cal.3d 134, 163–164 [266 Cal.Rptr. 309, 785 P.2d 857]; *People v. Boyer* (1989) 48 Cal.3d 247, 273–275 [256 Cal.Rptr. 96, 768 P.2d 610].)

■ But a defendant's decision to talk with police cannot be a product of police interrogation, "badgering," or "overreaching," whether "explicit or subtle, deliberate or unintentional." (*Smith v. Illinois, supra*, 469 U.S. at p. 98.) Without this limitation, police "might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." (*Ibid.*; see also *Michigan v. Harvey* (1990) 494 U.S. 344, 350 [108 L.Ed.2d 293, 110 S.Ct. 1176]; *Arizona v. Roberson* (1988) 486 U.S. 675, 681 [100 L.Ed.2d 704, 108 S.Ct. 2093].)

Here, it is unclear whether defendant independently decided to reopen the discussion of Polly's kidnapping, or whether he did so because Sergeant Meese told him after the fingerprinting at the jail that the police had enough evidence to convict defendant without any statements from him and to call Meese if defendant wanted to talk. (See *People v. Boyer, supra,* 48 Cal.3d at p. 275; *U.S. v. Szymaniak* (2d Cir. 1991) 934 F.2d 434; *U.S. v. Gomez* (11th Cir. 1991) 927 F.2d 1530; *U.S. v. Walker* (D.Md. 1985) 624 F.Supp. 103; *Blake v. Maryland* (2004) 381 Md. 218 [849 A.2d 410]; *Florida v. Brown* (1991) 592 So.2d 308; *Wainwright v. State* (Del. 1986) 504 A.2d 1096.) But even if we were to assume that defendant's decision to make a statement resulted from Sergeant Meese's comments to him after the fingerprinting, this circumstance is not significant because, as we previously explained (see *ante,* at p. 595), Meese was entitled to make those comments (which otherwise might well have been improper) in an effort to persuade defendant to provide information that could lead to the kidnapped Polly's rescue. Because Sergeant Meese's comments to defendant at the jail were permissible under the rescue doctrine, no overreaching occurred, and defendant was not "badgered by police officers in the manner in which the defendant in *Edwards* was." (*Bradshaw, supra,* 462 U.S. at p. 1044.) Therefore, regardless of why defendant decided to enter into further conversation with the police about Polly's kidnapping, that decision was not the product of any improper police conduct.

Moreover, undisputed evidence shows that defendant knowingly and intelligently waived his right to counsel before speaking with Sergeant Meese and FBI Agent Taylor when they returned to the jail after defendant's December 4, 1993, telephone conversation with Sergeant Meese. Defendant's comments during that telephone conversation with Sergeant Meese indicated a willingness to waive his previously asserted right to counsel and to make a statement. Defendant knew that Polly was dead; admitting that fact to Meese over the telephone risked turning a kidnapping case into one of murder. Defendant chose to take that risk. In addition, defendant was free to place limits on the scope of his decision to cooperate, including a refusal to waive his previously asserted right to counsel. He did not. Instead, defendant himself changed the dynamics of the conversation when he sought to make a plea bargain in exchange for helping the police locate Polly.

Defendant had two hours, between his decision to contact Sergeant Meese and the latter's return to the jail, to consider his options and how he wished to proceed. Moreover, as the trial court observed, defendant had "had a lot of contact with the justice system" and appeared to be "a very articulate person." In his later recorded interrogations, defendant indicated that he wanted to talk and that he had realized that he could not "play it out too long." He mocked the idea of a hypothetical defense attorney chastising him for having confessed. And Sergeant Meese, upon returning to the jail, im-

mediately took the further precaution of readmonishing defendant of his *Miranda* rights, which defendant waived without hesitation. Under these circumstances, defendant's waiver of his *Miranda* rights, after Sergeant Meese returned to the jail with FBI Agent Taylor, was knowing and voluntary.

For the reasons stated above, the trial court properly denied defendant's motion to suppress defendant's December 4, 1993, statements.

### 4. *Harmless error in the admission of defendant's statements*

Even assuming that the just described statements violated the principles of *Miranda, supra*, 384 U.S. 436, and *Edwards, supra*, 451 U.S. 477, the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Cunningham, supra*, 25 Cal.4th 926, 994.)

 If, after invoking the right to counsel, a suspect remains in custody, and the police initiate further questioning in the absence of counsel, the suspect's statements are presumed involuntary and are inadmissible as substantive evidence at trial, even if the suspect later waives the right to counsel and the statements would be considered voluntary under traditional standards. (*McNeil v. Wisconsin, supra*, 501 U.S. 171, 176–177; *People v. Cunningham, supra*, 25 Cal.4th at pp. 992–993; *People v. Crittenden, supra*, 9 Cal.4th 83, 128.) Therefore, if no exception to the *Miranda/Edwards* principles applied to Sergeant Meese's questioning of defendant on the morning of December 4, 1993, and their later telephone conversation, the failure to honor defendant's request for counsel would render all of his later confessions inadmissible in the prosecution's case-in-chief despite his willingness to waive his *Miranda* rights at the outset of each interrogation. (*People v. Peevy, supra*, 17 Cal.4th 1184, 1193 [statements obtained in violation of *Edwards* are not admissible in the prosecution's case-in-chief, but, if made voluntarily, may be used to impeach the defendant's credibility as a witness]; see also *Oregon v. Hass* (1975) 420 U.S. 714, 722 [43 L.Ed.2d 570, 95 S.Ct. 1215].)

 Any such violation of defendant's rights under *Miranda, supra*, 384 U.S. 436, and *Edwards, supra*, 451 U.S. 477, would not, however, taint the admissibility of any *physical evidence* derived from those confessions. The fruit of the poisonous tree doctrine does not apply to physical evidence seized as a result of a noncoercive *Miranda* violation (*United States v. Patane* (2004) 542 U.S. 630, 637–638, 645 [159 L.Ed.2d 667, 124 S.Ct. 2620]; *People v. Davis* (2005) 36 Cal.4th 510, 552 [31 Cal.Rptr.3d 96, 115 P.3d 417]; *People v. Whitfield* (1996) 46 Cal.App.4th 947, 957 [54 Cal.Rptr.2d 370]), and a violation of the prophylactic rules of *Miranda/Edwards* does not automatically mean that any ensuing confession was coerced. (See *People v.*

*Bradford* (1997) 14 Cal.4th 1005, 1039–1040 [60 Cal.Rptr.2d 225, 929 P.2d 544] [continued interrogation after a *Miranda/Edwards* violation does not "inherently constitute coercion" without evidence of actual coercion or other circumstances bearing on the suspect's free will].)

Under the totality of the circumstances here, defendant's December 4, 1993, confession to Petaluma Police Sergeant Meese over the telephone was not the product of coercion. (See *Withrow v. Williams* (1993) 507 U.S. 680, 689 [123 L.Ed.2d 407, 113 S.Ct. 1745] ["we continue to employ the totality-of-circumstances approach when addressing a claim that the introduction of an involuntary confession has violated due process"].) As already discussed, defendant was no stranger to the criminal justice system. He had freely confessed when arrested for previous crimes. (See *ante*, pt. II.D.1.) Sergeant Meese's questioning was neither harsh nor threatening. Nothing indicated that defendant was confused or misled by Meese's questions about Polly's whereabouts and whether she was still alive. (See *People v. DePriest* (2007) 42 Cal.4th 1, 35–36 [63 Cal.Rptr.3d 896, 163 P.3d 896] [rejecting a coerced confession claim where the defendant was not *Mirandized* during his 45-minute interrogation and initially said he was invoking his right to counsel, but the officer's questioning was not harsh or threatening, the defendant had prior experience as a felony suspect, and nothing indicated that the defendant was confused or intimidated].)

Without defendant's statements, the physical evidence still established defendant's guilt as to all the crimes charged and the special circumstances alleged. In addition to the eyewitness testimony identifying defendant as Polly's kidnapper, there was ample physical evidence linking defendant directly to the crimes. His palm print and matching DNA profile were found in Polly's bedroom, from which defendant had taken her. Fibers consistent with the bindings used in the crimes were located in defendant's car. Also, Polly's leggings and defendant's sweatshirt were found near the ditch where defendant was stranded on the night of the crimes.

The exclusion of defendant's various confessions would have reduced the quantum of evidence supporting defendant's conviction for the crime of attempting to commit a lewd act on Polly, as well as the special circumstance allegation that he killed Polly in the attempted commission of such an act. Even without defendant's statements, however, the physical evidence and defendant's prior crimes were strong evidence of the attempt. (See *post*, pt. III.B.)

Under these circumstances, the admission of defendant's statements, even if they had been obtained in violation of *Miranda, supra*, 384 U.S. 436, and *Edwards, supra*, 451 U.S. 477, was harmless beyond a reasonable doubt.

## 5. *Voluntariness of defendant's recorded confessions*

Defendant claims that his later recorded confessions, made on the afternoon, evening, and night of December 4 and December 6, 1993, were involuntary. He argues these confessions were coerced in light of the asserted violation of his rights under *Miranda, supra,* 384 U.S. 436, and *Edwards, supra,* 451 U.S. 477. This claim fails for the reasons given in part II.D.3, *ante,* where we rejected his claim that the trial court should have suppressed his statements on December 4, 1993, on the ground that they were obtained in violation of *Miranda* and *Edwards.*

Defendant also claims it was improper for Sergeant Meese to suggest to defendant that a confession to a sexual assault would not change defendant's predicament. During the first tape-recorded interrogation on December 4, 1993, Meese encouraged defendant to "get it all out in the open" and "get it off [his] chest," and to admit any unlawful sexual conduct because "[i]t ain't going to make a difference to anything that happens." In the December 6 confession, Meese again encouraged defendant to say whether he had sexually assaulted Polly, at one point commenting, "[i]t ain't gonna make a hill of beans as far as what goes on if you go to trial."

A confession elicited by any promise of benefit or leniency, whether express or implied, is involuntary and therefore inadmissible, but merely advising a suspect that it would be better to tell the truth, when unaccompanied by either a threat or a promise, does not render a confession involuntary. (*People v. Holloway* (2004) 33 Cal.4th 96, 115 [14 Cal.Rptr.3d 212, 91 P.3d 164].)

Here, Sergeant Meese's comments encouraging defendant to tell the truth were not accompanied by an impermissible promise of benefit or leniency. Sergeant Meese "said nothing beyond the obvious" (*People v. Holloway, supra,* 33 Cal.4th at p. 115) in that defendant's crimes, involving the kidnap and murder of a child, made him eligible for the death penalty. Meese correctly implied that any evidence of a sexual assault (or lack thereof) would not have altered that circumstance. Defendant himself acknowledged that he knew he faced the death penalty and even admitted he "deserved" it.

Defendant also contends that Sergeant Meese misled him during the December 6, 1993, interrogation by claiming that semen was found on Polly's body, assertedly to coax an admission of sexual assault and to prevent defendant from invoking his right to counsel. The record, however, supports the trial court's finding that Meese entertained a good faith belief that the

stain on Polly's panties could contain semen.[5] At the time, Meese properly relied upon a fluorescence test that indicated the possible presence of semen. "[G]ood faith confrontation is an interrogation technique possessing no apparent constitutional vice." (*People v. Andersen* (1980) 101 Cal.App.3d 563, 576 [161 Cal.Rptr. 707].)

## III. Guilt Phase Issues

### A. *Admission of Defendant's Prior Acts*

#### 1. *Background*

Defendant argues the trial court erred in admitting evidence of his 1976 assaults on Frances M., Marjorie Mitchell, Hazel Frost, and Josephine Kreiger, and his 1976 burglary of a garage on Linden Street in Napa, including statements he made regarding these crimes to court-appointed psychiatrists in 1977 and 1978. The court admitted this evidence at the guilt phase over defendant's objection that these crimes were dissimilar to the crimes involving Polly, they were too remote in time, and they were more prejudicial than probative of any relevant issue. Also over defendant's objection, the court admitted expert testimony concerning defendant's motive for the 1976 assaults and the crimes involving Polly.

The trial court admitted the evidence of the prior crimes against Frances M. and Frost to prove defendant's intent to commit sexual assault and a lewd act, his motive to commit a sexual offense, and the existence of a common scheme or plan to commit sexual assault and to steal. Evidence of the prior crimes against Mitchell was admitted for these same purposes (except to prove intent to commit sexual assault), as well as to prove intent to commit burglary and a common scheme or plan to commit burglary. Evidence of the prior burglary of the Linden Street garage was admitted to prove intent to commit burglary, motive to commit a sexual offense, and a common scheme or plan to commit burglary. The crimes against Kreiger were admitted for these same purposes and to prove a common scheme or plan to steal. The trial court instructed the jury that none of this evidence could be considered in this case "to prove that the defendant is a person of bad character or that he has a disposition to commit crimes."

---

[5] Even if Sergeant Meese was intentionally deceiving defendant about the presence of semen on Polly's panties, it was not the kind of deception that would be " ' "reasonably likely to procure an untrue statement." ' " (*People v. Jones* (1998) 17 Cal.4th 279, 299 [70 Cal.Rptr.2d 793, 949 P.2d 890], quoting *People v. Thompson, supra*, 50 Cal.3d at p. 167.)

## 2. *The prior crimes as evidence of intent and a common scheme or plan*

■ Generally, the prosecution may not use a defendant's prior criminal act as evidence of a disposition to commit a charged criminal act. (Evid. Code, § 1101, subd. (a).) But evidence is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

"To be admissible to show intent, 'the prior conduct and the charged offense need only be sufficiently similar to support the inference that defendant probably harbored the same intent in each instance.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1194 [17 Cal.Rptr.3d 532, 95 P.3d 811], quoting *People v. Yeoman* (2003) 31 Cal.4th 93, 121 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; accord, *People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757].) To be admissible to show a common scheme or plan, a greater degree of similarity is required than to show intent, and "the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Ewoldt, supra*, 7 Cal.4th at p. 403.)

■ Because evidence of other crimes may be highly inflammatory, the admission of such evidence " ' "must not contravene other policies limiting admission, such as those contained in Evidence Code section 352." ' " (*People v. Lewis* (2001) 25 Cal.4th 610, 637 [106 Cal.Rptr.2d 629, 22 P.3d 392], quoting *People v. Ewoldt, supra*, 7 Cal.4th at p. 404.) Under Evidence Code section 352, the probative value of a defendant's prior acts must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People v. Ewoldt, supra*, at p. 404; Evid. Code, § 352.) "We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." (*People v. Cole, supra*, 33 Cal.4th at p. 1195.)

Here, although the prior acts occurred 17 years before the crimes against Polly, they were not so remote as to warrant their exclusion, as defendant had only remained free from incarceration for a total of three years during the intervening period. (See *People v. Peete* (1946) 28 Cal.2d 306, 308–309, 318–319 [169 P.2d 924] [24-year lapse since prior conviction was "not significant" when the defendant had been incarcerated for 18 of those years].)

The prior crimes against Frances M. and Frost were sufficiently similar to this case to provide evidence of a common scheme or plan and intent to

commit a sexual assault or a lewd act.[6] In those offenses, as in this case, defendant abducted a stranger, a female; used a weapon; assured the victim that he would not harm her; took her to a remote location; and carried bindings with him, indicating that the behavior was planned. The sexual nature of the prior crimes against Frances M. and Frost was obvious from his attempt to force Frances M. to sexually gratify him and his statements to court-referred psychiatrists that he assumed he "would have some fun" with Frost, and that he masturbated twice daily thinking about these victims and tying them up.

Defendant emphasizes the age difference between Polly and adult victims Frances M. and Frost in arguing the dissimilarity of the present crime. But when Sergeant Meese asked defendant if Polly looked like she was 12 years old, defendant responded, "I never even think about her like that." Defendant repeatedly referred to Polly as a "broad," a slang term generally used to describe an adult woman, thus implying that he did not regard Polly's adolescence as significant.

The prior crimes against Mitchell and Kreiger and the burglary of the Linden Street garage were sufficiently similar to this case to provide evidence of a common scheme or plan and intent to commit burglary. In each case, defendant targeted the home of a stranger, was armed, focused on a female resident, and entered the residence with an intent to tie up or assault the victim under circumstances indicating that he lay in wait outside before executing his plan.

Defendant contends the trial court erred in allowing the jury to consider the prior crimes against Frances M., Mitchell, Kreiger and Frost as evidence of a common scheme or plan to steal, and that it erred in allowing the jury to consider defendant's prior assault against Mitchell as evidence of a motive and a common scheme or plan to commit a sexual assault or lewd act. Assuming for the sake of argument that the court erred in allowing the jury to consider these offenses for the described purposes, the error was harmless in view of the overwhelming evidence of guilt and because the trial court properly admitted the evidence of these offenses for the other purposes previously described in this part.

---

[6] These crimes would also be admissible under Evidence Code section 1108, to show that defendant had a predisposition to commit a sexual offense or lewd act in this case. (See *People v. Fitch* (1997) 55 Cal.App.4th 172, 185 [63 Cal.Rptr.2d 753] [§ 1108 applies to cases tried after its effective date of Jan. 1, 1996, and no ex post facto violation occurs when it is applied to a charged offense occurring before its enactment].)

### 3. *The prior crimes and expert testimony as evidence of motive*

Defendant contends the trial court erred in admitting his prior 1976 crimes as evidence of his motive to sexually assault Polly. We disagree.

Although motive is not an element of any of defendant's crimes, "the absence of apparent motive may make proof of the essential elements less persuasive . . . ." (*People v. Phillips* (1981) 122 Cal.App.3d 69, 84 [175 Cal.Rptr. 703].) Evidence of a defendant's prior criminal acts is admissible "when relevant to prove some fact (such as motive . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) Here, defendant's kidnapping of Polly, his failure to take items of significant value, the evidence of planning, and his use of the silky bindings and the intricately knotted "hood device" raised but did not fully answer questions about defendant's motive. Defendant's prior 1976 crimes were relevant and admissible to prove his motive to sexually assault Polly, as defendant admitted to having sexual fantasies about assaulting and binding his prior female victims.

Defendant contends that the trial court erred in permitting the prosecution to introduce expert testimony concerning paraphilia as an explanation of his motive in both this case and his prior crimes. He relies on *People v. McFarland* (2000) 78 Cal.App.4th 489 [92 Cal.Rptr.2d 884] (*McFarland*). At issue in *McFarland* was whether the defendant, who twice previously had been convicted of lewd conduct with a child under 14 years of age, had an unnatural or abnormal sexual interest in children, for purposes of section 647.6 (annoying or molesting a minor), when he stroked a four-year-old girl's arm and face. A psychiatrist called by the prosecution who had not examined the defendant testified, based on court documents and psychiatric reports from the defendant's prior convictions, that the defendant had such an interest. (*McFarland, supra*, 78 Cal.App.4th at p. 492.)

The Court of Appeal in *McFarland* concluded that the psychiatrist's testimony was inadmissible and reversed. A prosecutor, it held, may not present an *expert's opinion* about a defendant's predisposition to commit sexual offenses unless the defendant places his character regarding such matters at issue, as such evidence constitutes inadmissible character evidence. (See Evid. Code, §§ 1100, 1101, 1102.) The court noted that Evidence Code sections 1101, which allows the introduction of prior criminal acts in certain circumstances, and 1108, which allows propensity evidence to be used in certain sexual offense cases, only permit the prosecution to present evidence of specific acts, not expert testimony. (*McFarland, supra*, 78 Cal.App.4th at p. 495.) The court also held that the admission of the expert's opinion of the defendant's propensity to commit sexual offenses also "violated Penal Code section 29, which prohibits an expert from offering an

opinion on the ultimate question of whether the defendant had or did not have a particular mental state at the time he committed the offense." (*Id.* at p. 496.)

Here, the prosecution's expert, Dr. Park Elliott Dietz, defined the sexual disorder known as paraphilia, and he described the characteristics typical of persons who have those disorders. (See p. 562, *ante.*) Although he did not give a medical opinion or diagnosis that defendant was a paraphiliac, he testified that certain of defendant's prior crimes, in which he used weapons and prepared bindings for use on lone female victims, were "consistent" with the stages of a sexual assault by a paraphiliac, and that defendant's statement that he fantasized about tied-up crime victims while masturbating indicated that he was a paraphiliac. He also testified that defendant's behavior in the kidnapping and murder of Polly was "consistent" with paraphilia. Defendant argues that under the reasoning of *McFarland, supra,* 78 Cal.App.4th 489, the trial court should have excluded this testimony.

The trial court properly allowed Dr. Dietz to give a general description of paraphilia and the behavior typical of persons who have this disorder. Expert testimony of this nature "is admissible on any subject 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. Brown* (2004) 33 Cal.4th 892, 905 [16 Cal.Rptr.3d 447, 94 P.3d 574] [prosecution may present expert testimony regarding battered women's syndrome]; see also Evid. Code, § 805.)

It is a closer question whether the trial court erred when it permitted Dr. Dietz to testify that when defendant committed his prior assaults and when he kidnapped and murdered Polly, his behavior was "consistent" with paraphilia. But even if the court should have excluded this testimony, the error was harmless under any standard. As we have explained, the court properly admitted the evidence that defendant had repeatedly stalked, bound, and assaulted other women, as well as defendant's admission that he found his attacks sexually stimulating. Dr. Dietz's brief testimony that defendant's conduct was consistent with paraphilia drew a conclusion that the jury could easily have drawn by itself, without Dr. Dietz's help. Furthermore, the trial court instructed the jury not to consider Dr. Dietz's testimony as evidence that "the defendant is a person of bad character or that he had the requisite intent or mental state at the time of the commission of the crimes or that he has a disposition to commit crimes," and that his testimony could be used "only for the limited purpose of determining if it tends to show motive." Under these circumstances, any error could not have prejudiced defendant.

### B. *Sufficiency of Evidence for Attempted Lewd or Lascivious Act on a Child*

Defendant contends the evidence is insufficient to support his conviction for attempting to commit a lewd or lascivious act upon Polly and the jury's special circumstance finding that he killed Polly while attempting to commit such an act.

To determine the sufficiency of evidence to support a conviction or a special circumstance, "an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128 [113 Cal.Rptr.2d 27, 33 P.3d 450]; see also *People v. Tafoya* (2007) 42 Cal.4th 147, 170 [64 Cal.Rptr.3d 163, 164 P.3d 590].) "Where, as here, the jury's findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, 'but our opinion that the circumstances also might reasonably be reconciled with a contrary finding' does not render the evidence insubstantial." (*People v. Earp* (1999) 20 Cal.4th 826, 887–888 [85 Cal.Rptr.2d 857, 978 P.2d 15], quoting *People v. Proctor* (1992) 4 Cal.4th 499, 528–529 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

 The crime of a lewd or lascivious act upon a child requires a touching of a child under the age of 14 with the specific intent "of arousing, appealing to, or gratifying the lust, passions, or sexual desires" (§ 288, subd. (a)) of the defendant or the child. "An attempt to commit a crime has two elements: the intent to commit the crime and a direct ineffectual act done toward its commission." (*People v. Carpenter* (1997) 15 Cal.4th 312, 387 [63 Cal.Rptr.2d 1, 935 P.2d 708].) For purposes of an attempt, "[s]pecific intent may be, and usually must be, inferred from circumstantial evidence." (*People v. Cole* (1985) 165 Cal.App.3d 41, 48 [211 Cal.Rptr. 242].) Evidence of prior crimes is probative of a person's intent on a later occasion. (*People v. Carpenter, supra,* 15 Cal.4th at p. 379.) When a defendant's intent is " 'clearly shown, slight acts done in furtherance of that design will constitute an attempt, and the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime.' " (*People v. Memro* (1985) 38 Cal.3d 658, 698 [214 Cal.Rptr. 832, 700 P.2d 446].)

Here, evidence of defendant's preparation before kidnapping Polly, coupled with his prior history of sexual assaults on women, strongly indicates his intent to commit a lewd and lascivious act against Polly. Moreover, the

absence of any prior relationship with Polly or any financial motive for abducting her points to a single conclusion: that defendant's crimes were sexually motivated.

Witnesses saw defendant in Polly's neighborhood in the weeks before the crime; and just hours before her abduction, a witness saw defendant in Polly's neighborhood driving past the park on Polly's street corner about the time when Polly and her friend Gillian walked to the local market and played outside Polly's home. Thus, the jury reasonably could infer that defendant had been stalking Polly well in advance of his crimes.

Defendant broke into Polly's home carrying prepared bindings and restraints. The bindings he used to tie up Polly and her friends and the cloth he used to strangle Polly had been previously cut in his car from the same piece of silky cloth, which might have originally been an article of women's lingerie or a nightgown. The peculiar "cloth hood" restraint, found near the Pythian Road site where defendant's car had become stuck in a ditch, not only was cut from the same silky material as the precut bindings, but it was so intricately shaped and knotted that the jury reasonably could infer that defendant prepared it in advance. Defendant's prior assaults against Frost and Frances M., and Dr. Dietz's testimony concerning paraphilia and cordophilia, further illuminated the purpose of these bindings and permitted the jury to conclude that defendant had planned the burglary and kidnapping and acted with a sexual motivation.

In addition, the state of Polly's clothing evidenced a sexual purpose. Although she was still wearing her bra and panties, her pink shirt top had been untied, and her skirt was inverted around her with the nightgown pulled up, revealing her legs and lower torso. Defendant argues that the pulled-up clothing was caused by animal activity, as her skeleton was missing bones from the torso area. This theory is inconsistent, however, with the pictures of Polly's body at the Dutcher Creek location showing that the skirt was pulled up and inverted under her arms, which were folded across her lap. And defendant's theory is also inconsistent with eyewitness testimony that the nightgown was similarly pulled up. The position of Polly's arms makes it unlikely that animal activity was able to evenly invert her clothing and suggests that defendant pulled up and inverted the clothing when he placed her there. In addition, pathologist Dr. Chapman suggested that Polly's legs had been purposefully spread apart; he would not have expected both legs to be in that position if the body had been haphazardly thrown there.

Aside from the physical evidence, there were statements by defendant indicative of an effort to hide sexual conduct with Polly at the Pythian Road site near Dana Jaffe's home. He first said he left none of his clothes on Jaffe's

hillside, claiming he discarded his sweatshirt and the bindings while driving back to San Mateo. When Sergeant Meese told him the police had found his sweatshirt on Jaffe's property, defendant expressed surprise, hesitated, and then began to repeat that he "didn't do nothin' to her" on the hill. Defendant also initially denied going back up the hill after his roadside encounter with Shannon Lynch, but when Meese confronted him with Dana Jaffe's claim that she did not see defendant on the roadside when she drove down her private road about 20 minutes after defendant's encounter with Lynch, defendant admitted going back up the hill and blurted out, "I didn't do it to her, man." Finally, despite having recalled the details of his encounter with the sheriff's deputies who pulled him out of the ditch, defendant suddenly claimed lapses of memory and gave equivocal answers when asked if he had sexually assaulted Polly. Defendant said that, if he did, he "blocked" it out of his mind, and that "If I did anything to her, I don't want to know." Given that defendant also said that a sexual assault on Polly "would be a hard one to admit to" and had repeatedly expressed concern about being labeled as a child molester in prison, it was reasonable to assume that defendant, while confessing to Polly's murder, was determined to avoid admitting the sexual offense against her.

Accordingly, the evidence amply supported the offense and special circumstance of an attempted lewd or lascivious act upon Polly.

### C. Sufficiency of Evidence for Robbery and Robbery-murder Special Circumstance

In addition to kidnapping Polly, defendant removed two items from her home: red leggings, taken from a dresser drawer, and a nightgown belonging to her friend, Gillian P., taken from a plastic bag Gillian had brought to Polly's house for their slumber party. Defendant contends that his intent to steal the leggings and nightgown did not arise until after he bound the girls; thus, he argues, there is insufficient evidence to support his convictions for robbing Polly and Gillian and the related special circumstance finding. We disagree.

"Robbery is the taking of 'personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property.'" (*People v. Lewis, supra,* 43 Cal.4th 415, 464, quoting CALJIC No. 9.40.)

Even if in this case defendant's intent to steal arose only after he bound the girls, sufficient evidence supports the robbery convictions. Gillian and Polly remained blindfolded and bound when defendant carried away the

leggings and the nightgown, and they had every reason to believe that they were still being held hostage at knifepoint, given defendant's earlier threat to slit their throats. Because "a robbery can be accomplished even if the property was peacefully or duplicitously acquired, if force or fear was used to carry it away," the evidence supports the jury's determination that defendant used force and fear to take the property. (*People v. Gomez* (2008) 43 Cal.4th 249, 256 [74 Cal.Rptr.3d 123, 179 P.3d 917].) Although Polly and her friend, Gillian, may not have been aware of the thefts because they were blindfolded, that circumstance is irrelevant, for as long as force or fear is used, it makes no difference that the victim was unaware of the robbery. (*People v. Jackson* (2005) 128 Cal.App.4th 1326, 1331 [27 Cal.Rptr.3d 793].) Consequently, sufficient evidence supported both robbery convictions.

Defendant argues the evidence shows that he committed the robberies only to facilitate his murder of Polly, and thus they cannot serve as the foundation for a robbery-murder special circumstance. We disagree.

 For a felony-murder special circumstance to apply, the felony cannot be merely "incidental or ancillary to the murder"; it must demonstrate "an independent felonious purpose," not an intent "simply to kill." (*People v. Abilez* (2007) 41 Cal.4th 472, 511 [61 Cal.Rptr.3d 526, 161 P.3d 58]; see also *People v. Marshall* (1997) 15 Cal.4th 1, 41 [61 Cal.Rptr.2d 84, 931 P.2d 262] [a letter taken by the defendant from the victim as a token of her rape and murder was insufficient to sustain the defendant's robbery-murder special circumstance, because the taking of the letter was merely incidental to the murder].) But even if a defendant harbored the intent to kill at the outset, a concurrent intent to commit an eligible felony will support the special circumstance allegation. (*People v. Raley* (1992) 2 Cal.4th 870, 903 [8 Cal.Rptr.2d 678, 830 P.2d 712]; see also *People v. Abilez, supra*, 41 Cal.4th 472, 511 [sufficient evidence supported special circumstance allegations of robbery, burglary, and sodomy murder, as the defendant demonstrated independent felonious purposes consisting of an intent to take money and a desire to injure and humiliate the victim through the forced sex act].)

Here, the evidence shows that defendant's primary motive in entering Polly's home was to kidnap and sexually abuse her, not to kill her. Defendant appears to have taken the leggings to use as a gag, thereby facilitating his kidnapping and sexual assault of Polly. It is less clear why defendant took the nightgown; perhaps (as the prosecutor theorized) he took it to cover Polly's body while he was moving her from her home to his car, or perhaps he wanted Polly to wear it while he was sexually assaulting her. But there is no evidence that defendant took the leggings or the nightgown to facilitate his later murder of Polly, or that he had decided to kill her when he took those items. Defendant told the police that he only decided to kill Polly *after* he

had kidnapped her in order to "cover [his] tracks." Thus, by his own admission, defendant killed Polly to conceal the felonies he had already committed. As a result, the robberies of Polly and Gillian may have been incidental to the kidnapping and the attempted sexual assault, but they were not incidental to Polly's murder. Therefore, the jury properly could find true the robbery-murder special-circumstance allegation.

### D. Jury Viewings of the Crime Scenes

Defendant contends the trial court erred prejudicially by granting, over his objection, the prosecution's motion to allow the jury to view the various crime scenes in Sonoma County. In supplemental briefing, defendant argues that the court erred by failing to obtain his personal waiver of his presence during certain portions of the jury's view of the crime scenes.

 The trial court may allow the jury to "view the place in which the offense is charged to have been committed, or in which any other material fact occurred." (§ 1119.) We review for abuse of discretion a trial court's ruling on a party's motion for a jury view. (*People v. Lawley* (2002) 27 Cal.4th 102, 158 [115 Cal.Rptr.2d 614, 38 P.3d 461].)

Here, the jury toured the exterior of Polly's home in Petaluma and the surrounding neighborhood and had a nighttime and daytime viewing of the Pythian Road site where defendant's car had become stuck in a ditch on the night of Polly's kidnapping. Because of the potential prejudice posed by an unofficial memorial erected at the site where Polly's body had been recovered in Cloverdale, the trial court did not allow the jury to visit the site; instead, the jurors observed the location from a spot roughly one-half mile away.

In light of the notoriety of the case and security concerns, defendant attended the viewing while secured in a police van with tinted, closed windows. As a result, although defendant accompanied the jury for each viewing, he could not fully hear any comments and could not see some portions of the viewings. Consequently, the trial court obtained from defendant's counsel waivers of defendant's "audible appearance" for the jury's viewing of the exterior of Polly's home in Petaluma and its nighttime viewing of the Pythian Road site. Defendant's counsel also waived defendant's personal appearance during the jury's daytime viewing of the latter site, as the police van containing defendant was parked in a place where defendant could not see the site.

We find no error in the trial court's decision to permit the jury viewings of the crime scenes under the described conditions. The court reasoned that the

probative value of seeing the locations in person could not be duplicated by photographs or witness testimony, and that the viewings would allow the jury to better gauge the distances involved between the locations at issue. Defendant fails to demonstrate any prejudice outweighing the trial court's sound reasons for permitting the jury viewings of the crime scenes.

■ As to the trial court's failure to obtain a personal waiver from defendant pertaining to his inability to see or hear some aspects of the jury viewings, it is true that a trial court must obtain a personal waiver of a defendant's appearance at a jury's viewing of a crime scene (§ 977; *People v. Moon* (2005) 37 Cal.4th 1, 20–21 [32 Cal.Rptr.3d 894, 117 P.3d 591]; see also *People v. Garcia* (2005) 36 Cal.4th 777 [31 Cal.Rptr.3d 541, 115 P.3d 1191]); but the court's failure to obtain such a waiver is statutory error, reversible only if there is a reasonable probability that the result would have been more favorable to defendant without the error (*People v. Moon, supra,* 37 Cal.4th at pp. 20–21). Here, because defendant provides no basis for concluding that the result of his trial would have been different if he had been able to see all aspects of the jury viewings, any error under section 977 was harmless. (*Moon,* at p. 21.)

### E. *In-court Display of Defendant's Tattoos*

Defendant claims the trial court erred when it allowed an eyewitness, Daryl Stone, to identify defendant based on his observation of defendant's tattooed arms, which the trial court directed defendant to display in open court by rolling up his sleeves. Before trial, the prosecution and the defense had agreed to use an identification procedure where the prosecutor would show Stone a photographic lineup of various tattooed arms, without displaying anyone's faces; but when the state called Stone as a witness during the trial, the prosecutor presented no photographic lineup and decided to rely upon an in-court display instead. The trial court overruled defendant's objection to this new identification procedure. Defendant claims the in-court display was unduly suggestive and violated several of his federal and state constitutional rights, including his right to due process.

■ There was no error. For purposes of an in-court identification, "[f]orced exhibition of 'real or physical' evidence, such as of a physical characteristic, does not constitute a fundamental unfairness which is a violation of due process . . . ." (*People v. Sims* (1976) 64 Cal.App.3d 544, 552 [134 Cal.Rptr. 566] [an in-court identification procedure, by which defendant was compelled to read seven statements made by the assailant, was not " 'impermissibly suggestive' "]; see also *People v. Holt* (1972) 28 Cal.App.3d 343, 350–352 [104 Cal.Rptr. 572].) Defendant here suggests no reason why a

different standard should apply to the identification of a tattoo than to other physical characteristics that a witness may rely on to make an in-court identification.

### F. *Prosecutorial Misconduct*

Defendant contends the prosecutor engaged in various acts of misconduct during the trial. As to each act, we either conclude no misconduct occurred or that any misconduct was not prejudicial to defendant.

 "[O]n claims of prosecutorial misconduct our state law standards differ from those under the federal Constitution." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070 [81 Cal.Rptr.3d 651, 189 P.3d 911].) Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464].) By contrast, our state law requires reversal when a prosecutor uses "deceptive or reprehensible methods to persuade either the court or the jury" (*People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610]) and " 'it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct' " (*People v. Wallace, supra*, 44 Cal.4th at p. 1071). To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm. (*People v. Tafoya, supra*, 42 Cal.4th 147, 176.)

Defendant here claims the prosecution violated an earlier agreement between the parties by referring to the fluorescence test for semen performed on a stain found on Polly's panties during its opening arguments and by eliciting testimony regarding the test from two of the state's expert witnesses.

The fluorescence of the stain on the panties was the source of considerable discussion during in limine proceedings. While the parties recognized the potential prejudice inherent in any testimony concerning the stain, they also recognized that the existence of the stain could not be concealed from the jury, because defendant's December 6, 1993, confession centered on Petaluma Police Sergeant Meese's good faith belief that the fluorescence test indicated the presence of semen. Before the final round of jury selection, the parties stipulated that, if called as a witness, FBI Special Agent Valerie Ladner would testify that she had tested the panties for the presence of bodily fluids and "[t]hat the tests performed did not detect the presence of semen on the panties." This stipulation, however, was never used, as Agent Ladner testified that the stain did fluoresce, but that her further testing indicated that

either no semen was ever present or that it had degraded to an undetectable level. Defendant made no objection to this testimony, and he revisited it during cross-examination.

Thus, not only did defendant fail to object to the prosecution's opening statements about the stain, but those statements were consistent with FBI Agent Ladner's testimony, and they were not misleading. The same is true of the prosecution's examination of the pathologist, Dr. Chapman, as defendant posed no objection and the testimony was consistent with that of FBI Agent Ladner. Earlier in the proceedings, defendant did successfully object to the prosecution's questioning of Petaluma Police Officer Charles Illsley about his experience with the decomposition of a body and semen, but defendant failed to object when other witnesses addressed the subject of the stain, thereby forfeiting any claim of error. (*People v. Ghent* (1987) 43 Cal.3d 739, 766 [239 Cal.Rptr. 82, 739 P.2d 1250] [claims regarding the prejudicial effect of testimony were forfeited where similar testimony was elicited from another witness without objection].) In any event, none of the testimony concerning the stain was inconsistent with the proposed stipulation or Agent Ladner's testimony. Consequently, the record does not support defendant's claim that the prosecutor elicited false or misleading testimony concerning the stain.

Also lacking merit are defendant's remaining claims of prosecutorial misconduct.

Although the trial court's pretrial ruling excluded evidence that defendant had burglarized a Napa animal shelter and stolen some weapons in 1976, during a Napa police officer's testimony concerning the prior assault against Marjorie Mitchell the prosecution elicited a reference to the investigation of a theft of firearms from an animal shelter break-in and asked the officer if he had questioned defendant about it. Out of the jury's presence, defendant objected to this evidence, the prosecutor apologized, and the trial court warned the prosecutor not to elicit further evidence on this subject. Defendant now argues that the prosecutor committed misconduct by eliciting this testimony. Defendant, however, did not request an admonition or request that the officer's testimony be stricken, and he did not later object to witnesses who not only spontaneously mentioned the incident but also directly inculpated defendant in the animal shelter break-in. Defendant also did not object when evidence of his conviction in the animal shelter break-in was admitted into evidence. Thus, defendant forfeited any objection based on the prejudicial effect of the testimony at issue. (*People v. Montiel* (1993) 5 Cal.4th 877, 914 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) Moreover, even assuming that defendant did not forfeit this claim, the first reference to the animal shelter break-in did not inculpate defendant and, at worst, only vaguely connected the incident to defendant. This was not a deceptive or misleading tactic and did not constitute prosecutorial misconduct.

Defendant also argues that the prosecution's last-minute decision to switch the tattoo identification procedure for witness Daryl Stone amounted to misconduct. As explained previously in part III.E., *ante*, even though there was a previous agreement to use a tattoo photographic lineup, the prosecutor did not act improperly in electing instead to use an in-court display of defendant's tattoos.

During closing argument at the penalty phase, the prosecution made reference to the testimony of Drs. Dietz and O'Meara concerning sexual sadism, arguing that this condition had caused "terrible problems in society for many victims" and suggesting that defendant had had this condition for over 20 years. Defendant objected to this testimony as improperly arguing the lack of mitigation as a factor in aggravation and as using his character as an aggravating factor. The trial court, without sustaining the objection, acknowledged that the absence of a mitigating factor does not constitute an aggravating factor; it then allowed the prosecutor to resume his argument. Contrary to defendant's claim that this argument by the prosecutor was improper, we see no reasonable likelihood that the jury understood the prosecutor to have argued that a lack of mitigating evidence constituted a factor in aggravation. Instead, the prosecutor pointed out to the jury that the evidence of defendant's prior violent crimes, properly admitted under section 190.3, factor (b), revealed a character consistent with a form of sexual deviance. (*People v. Lewis, supra,* 25 Cal.4th 610, 672 ["At the penalty phase of a capital trial, a prosecutor is permitted to argue any reasonable inferences from properly admitted evidence of a defendant's prior violent crime, even if such inferences relate to the defendant's character as revealed in the prior violent crime itself or in its surrounding circumstances."].)

Later, the prosecutor here argued that the highly publicized nature of the case was a factor in aggravation, but defendant objected immediately and the trial court promptly admonished the jury not to consider the case's effect on the public at large as an aggravating factor. Assuming this argument was improper, as defendant contends, it did not prejudice defendant, as the trial court properly countered the prosecution's rhetoric with a correct statement of law. (*People v. Osband* (1996) 13 Cal.4th 622, 717 [55 Cal.Rptr.2d 26, 919 P.2d 640] ["When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former . . . ."].)

## G. *Admission of Photographic Evidence*

Over a defense objection, the trial court admitted several photographs showing the condition of Polly's body as it was recovered at the Dutcher Creek site, and 1993 school photographs of murder victim Polly and her two

friends, Kate and Gillian, who were with Polly at her home on the night in question. Defendant argues that the photographs were inflammatory and cumulative to witness testimony and that their probative value was outweighed by the resulting prejudice.

■ When conditions depicted in photographic evidence are relevant to the prosecution's case, it is "not obliged to prove these details solely from the testimony of live witnesses, and the jury was entitled to see how the physical details of the scene and body supported the prosecution theory" of the crimes. (*People v. Turner* (1990) 50 Cal.3d 668, 706 [268 Cal.Rptr. 706, 789 P.2d 887]; see also *People v. Scheid* (1997) 16 Cal.4th 1, 13–18 [65 Cal.Rptr.2d 348, 939 P.2d 748].) "[T]he decision to admit victim photographs is a discretionary matter we will not disturb on appeal unless the prejudicial effect of the photographs clearly outweighs their probative value." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1168 [113 Cal.Rptr.2d 827, 34 P.3d 937].)

As discussed previously, the photographs were relevant to show that the victim was found in a " 'sexually suggestive position' " and to refute defendant's claim that Polly's legs had been spread apart and her skirt lifted upward by animal activity. (*People v. Bradford, supra*, 14 Cal.4th 1005, 1050; *People v. Pride, supra*, 3 Cal.4th 195, 243.) Moreover, we have reviewed the photographs in question and agree with the trial court that they are not gruesome. They do not depict blood or show Polly's face. As Polly's skull had separated from the rest of the body, it was not clearly visible in the photos, with one exception, and the trial court specifically ordered the excision of the skull from that photo.

As to the school photographs, since the trial took place two and a half years after the crimes, they were relevant to show how the two surviving victims looked as preteens in 1993 and to support the prosecution's claim that defendant selected Polly because she was the most mature looking of the three girls. Defendant fails to persuade us that these photographs were unduly inflammatory given their relevance. (*People v. Zapien* (1993) 4 Cal.4th 929, 983 [17 Cal.Rptr.2d 122, 846 P.2d 704] [photo of victim taken before murder was admissible to show motive related to her attractiveness].)

Consequently, the trial court did not abuse its discretion in admitting any of the challenged photographs.

### H. *Claims of Instructional Error*

Defendant contends that seven standard CALJIC instructions (CALJIC Nos. 2.01, 2.02, 2.09, 2.50, 2.50.1, 2.50.2 & 2.51) undermined the presumption of innocence and lowered the burden of proof to less than that of beyond

a reasonable doubt. Defendant acknowledges, however, that we have previously upheld the use of these instructions (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 221 [79 Cal.Rptr.3d 125, 186 P.3d 496]; *People v. Reliford* (2003) 29 Cal.4th 1007, 1012–1016 [130 Cal.Rptr.2d 254, 62 P.3d 601]; *People v. Catlin* (2001) 26 Cal.4th 81, 146–147 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Carpenter, supra,* 15 Cal.4th 312, 382–383), and we reject his request to reconsider our previous rulings.

Defendant claims error in the trial court's refusal to give three of his requested pinpoint instructions. He is wrong, as explained below.

Defendant asked that the jury be instructed that, by presenting defendant's statement to police denying he committed a lewd act upon Polly, the prosecution was bound by his denial in the absence of substantial evidence to the contrary. (See *People v. Collins* (1961) 189 Cal.App.2d 575 [11 Cal.Rptr. 504].) We need not determine whether the refusal to so instruct was error because, assuming the trial court had instructed the jury as requested, defendant would not have benefitted. As the court noted, there was ample evidence contradicting his statements to the police. (See *People v. Lines* (1975) 13 Cal.3d 501, 505–506 [119 Cal.Rptr. 225, 531 P.2d 793].)

The trial court rejected as duplicative defendant's two requested pinpoint instructions requiring "the prosecution to prove that the defendant had a purpose for the [attempted lewd act, robbery, burglary and kidnapping] wholly independent of murder," and instructing the jury that it "may not convict the defendant of first degree murder based upon the commission or attempted commission of burglary if the defendant entered the premises with the intent to [murder]." Instead, the court gave CALJIC No. 8.81.17, which instructed that "the special circumstance referred to in these instructions is not established if the robbery, kidnapping, or lewd act on a child was *merely incidental* to the commission of the murder." (Italics added.)

After a day and a half of deliberations, however, the jury asked: "What is the definition of 'merely incidental'?" The parties agreed to give the jury a definition of "incidental" from Black's Law Dictionary: "[D]epending upon or appertaining to something else as primary; something necessary, appertaining to, or depending upon another which is termed the principal, something incidental to the main purpose." Defendant contends that this definition was vague and ambiguous, and that it should have been supplemented by a nonlegal dictionary definition or replaced by his requested pinpoint instructions.

Defendant faults the trial court for not consulting an ordinary dictionary. But defense counsel said that a common dictionary meaning would not be

helpful, assented to the use of the definition in Black's Law Dictionary, and did not renew his request for the pinpoint instructions. Thus, defendant has forfeited the claim of error. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

Forfeiture aside, the definition given by the trial court was superior to defendant's proposed pinpoint instructions because it was better targeted to the specific issue that caused the jurors' concern. Defendant fails to explain why that definition was deficient. Defendant relies on a posttrial article (brought to the trial court's attention in defendant's unsuccessful motion for a new trial) that was written by the jury's foreperson and published in the August 11, 1996, edition of the San Jose Mercury News. The article said the jury "spent almost two days" on the single issue of whether the robbery was "merely incidental." But the foreperson's comment is inadmissible evidence of the jurors' mental thought processes. (Evid. Code, § 1150, subd. (a).) In any event, the jury's difficulty with this issue does not necessarily mean that it was improperly instructed; rather, the jury may simply have grappled with the evidence pertaining to the robbery. (See *People v. Brown* (1985) 40 Cal.3d 512, 535 [230 Cal.Rptr. 834, 726 P.2d 516] [rejecting the argument that the jury's lengthy deliberations showed prejudice and noting that "the jury may simply have sifted the evidence with special care . . ."], revd. on other grounds *sub nom. California v. Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].)

## IV. PENALTY PHASE

### A. *Admission of Victim Impact Evidence*

Defendant faults the trial court for admitting, over his objection, the testimony by victims of his prior crimes about how his crimes affected their lives. Defendant argues this evidence was not admissible as an aggravating circumstance under section 190.3, and that its admission violated his rights under the Eighth Amendment to the federal Constitution. We disagree.

Defendant is right that the impact of his past crimes on the victims of those crimes was not admissible under section 190.3, factor (a), because that factor bears only on "[t]he circumstances of the crime of which the defendant was convicted in the *present* proceeding." (Italics added.) But that evidence was admissible under section 190.3, factor (b), as relevant to his prior violent crimes. (*People v. Price, supra*, 1 Cal.4th at p. 479 [during the penalty phase, "the prosecution may introduce evidence of the emotional effect of defendant's prior violent criminal acts on the victims of those acts"].) Unavailing is defendant's reliance on *Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597]. There, the high court considered only the admissibility

of victim impact evidence concerning the capital offense itself, concluding that the Eighth Amendment does not automatically bar such evidence. (*Payne*, at p. 827.)

Defendant cites decisions from other jurisdictions holding that victim impact evidence pertaining to a defendant's prior crimes is inadmissible. (*People v. Dunlap* (Colo. 1999) 975 P.2d 723, 744–745; *People v. Hope* (1998) 184 Ill.2d 39 [234 Ill.Dec. 379, 702 N.E.2d 1282]; *Sherman v. State* (1998) 114 Nev. 998 [965 P.2d 903, 914]; *State v. Nesbit* (Tenn. 1998) 978 S.W.2d 872, 891, fn. 11; *Cantu v. State* (Tex.Crim.App. 1997) 939 S.W.2d 627, 637.) Those cases, although not free from ambiguity, do not appear to state that the federal Constitution prohibits admission of such evidence; rather, each holds that such evidence is irrelevant or inadmissible by applying the laws of the state in which the case was decided. Thus, they do not appear to support defendant's claim that the admission of such evidence violated the Eighth Amendment. At any rate, they are not binding on this court, which has repeatedly held that the Eighth Amendment does not prohibit the admission of testimony by a defendant's prior victims concerning the impact of his violent crimes against them. (*People v. Mendoza* (2000) 24 Cal.4th 130, 186 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Garceau* (1993) 6 Cal.4th 140, 167–168, 201–202 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People v. Benson* (1990) 52 Cal.3d 754 [276 Cal.Rptr. 827, 802 P.2d 330]; see also *Belcher v. State* (Fla. 2007) 961 So.2d 239 [victim impact evidence concerning the defendant's prior violent felony is admissible under state statute].) Moreover, there was no reasonable possibility that any error in admitting the evidence affected the jury's decision to impose a penalty of death. Even without the victim impact testimony, the evidence of the prior crimes themselves left little doubt about the impact of those crimes on defendant's victims.

Defendant also renews here his objections in the trial court to the admission of Petaluma Police Sergeant Meese's testimony regarding his observations of Eve Nichol (Polly's mother) and her six-year-old daughter (Annie) and a photograph taken of them shortly after Polly's kidnapping as speculative and cumulative victim impact evidence. We see no error.

Over defendant's objection, Sergeant Meese testified that on the night of the kidnapping, Eve Nichol appeared to be "in a state of shock and anguish," and he identified a photograph, taken that same night by Officer Pelton, of a visibly upset Eve Nichol sitting in a living room chair, with young Annie curled up in Eve's lap. "The purpose of victim impact evidence is to demonstrate the immediate harm caused by the defendant's criminal conduct." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1183 [13 Cal.Rptr.3d 34, 89 P.3d 353].) The photograph and Meese's testimony concerning the appearance of Polly's mother and young sister in the hours after Polly's kidnapping

captured the immediate harm of defendant's crimes. In *People v. Stitely* (2005) 35 Cal.4th 514, 565 [26 Cal.Rptr.3d 1, 108 P.3d 182], we held that a photograph of the murder victim taken with her husband before the crime properly "implied that Carol's loved ones suffered grief and pain over her loss." Here, the photograph and testimony at issue do not merely imply such anguish, they demonstrate it.

### B. *Exclusion of Evidence in Mitigation and Admission of Evidence in Aggravation*

Defendant challenges several trial court rulings concerning the exclusion and admission of certain evidence. We see no error.

Defendant complains the trial court erred in refusing to admit a photograph of two of his older half siblings whom defendant's mother gave up for adoption before he was born. The court properly ruled that the photograph was irrelevant, as there was no indication that defendant was ever aware of these siblings during his childhood.

Defendant claims the trial court erred by refusing to issue a body attachment for his brother, Don Davis. As the court pointed out, however, it had no jurisdiction to do so, as Don had fled the state before the defense could serve him with a subpoena. (See Code Civ. Proc., § 1993, subd. (a)(1) [a bench warrant may issue only "upon proof of the service of the subpoena"].)

Defendant contends the trial court erred by sustaining the prosecution's objection when defense counsel tried to ask defendant's sister, Darlene Schwarm, how she would be affected if defendant were sentenced to death. Later recognizing that a defense attorney may elicit opinions from a capital defendant's family members about the appropriate punishment (*People v. Lancaster* (2007) 41 Cal.4th 50, 98 [58 Cal.Rptr.3d 608, 158 P.3d 157]; *People v. Mickle* (1991) 54 Cal.3d 140, 194 [284 Cal.Rptr. 511, 814 P.2d 290]), the trial court invited the defense to re-call Schwarm as a witness. Defendant's failure to re-call her forfeited the issue for purposes of appeal (*People v. Rodrigues, supra*, 8 Cal.4th 1060, 1119), and, in any event, even without such testimony the jury would have inferred that Schwarm wanted her brother's life spared because she had testified that defendant was "the only family I have left."

Defendant argues the trial court prejudicially erred by admitting certain evidence in aggravation. As we will explain, much of the evidence was admissible, and any error pertinent to the remainder was harmless under either the state "reasonable possibility" standard for penalty phase error (*People v. Brown* (1988) 46 Cal.3d 432, 446–448 [250 Cal.Rptr. 604, 758 P.2d

1135]), or the "harmless beyond a reasonable doubt" standard for federal constitutional error (*Chapman v. California, supra*, 386 U.S. 18, 24).

Defendant contends the trial court erred by allowing the prosecution to introduce hearsay statements describing his involvement in three robberies committed in Kennewick, Washington, in 1985. Two police officers testified and recited hearsay statements taken from defendant's victims at the robbery scenes. The trial court overruled defendant's confrontation clause objection to these hearsay statements and admitted the statements as spontaneous utterances (Evid. Code, § 1240), because the victims were still under the stress of the robberies when the officers questioned them. Even assuming that the admission of these statements was error under the recent holdings of the high court in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] and in *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266], the error was harmless under both the federal and state standards, as the prosecution also introduced defendant's confessions to each of these three robberies (*People v. Brown, supra*, 46 Cal.3d at pp. 446–448; *Chapman v. California, supra*, 386 U.S. at p. 24).

Defendant also faults the trial court for allowing the prosecution, over his objection, to cross-examine defense expert Dr. George Woods about defendant's lack of remorse and later to call Dr. Kathleen O'Meara in rebuttal to discuss remorse. Although a prosecutor cannot argue a lack of remorse as a factor in aggravation, the presence or absence of remorse may be considered as relevant to the evaluation of mitigating evidence and to the penalty determination, and the evidence in question was admissible for this purpose. (*People v. Jurado* (2006) 38 Cal.4th 72, 141 [41 Cal.Rptr.3d 319, 131 P.3d 400]; *People v. Cook* (2006) 39 Cal.4th 566, 611 [47 Cal.Rptr.3d 22, 139 P.3d 492].) In addition, as Dr. Woods had diagnosed defendant as suffering from antisocial personality disorder, which includes the lack of remorse as one of its diagnostic criteria, the prosecution was entitled to explore the basis of Dr. Woods's diagnosis. (*People v. Ledesma* (2006) 39 Cal.4th 641, 695 [47 Cal.Rptr.3d 326, 140 P.3d 657]; *People v. Clark* (1993) 5 Cal.4th 950, 1016 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

Defendant contends the trial court erred in allowing prosecution expert Dr. O'Meara, over objection, to use the assertedly inflammatory term "sexual sadism" in her diagnosis of defendant. As the trial court noted, however, no legal authority requires the exclusion of this evidence, and defendant's presentation of Dr. Woods's diagnosis of antisocial personality disorder opened the door to rebuttal testimony questioning that diagnosis or suggesting an alternative diagnosis. (*People v. Smith* (2005) 35 Cal.4th 334, 359 [25 Cal.Rptr.3d 554, 107 P.3d 229].)

## C. *Rejection of Defendant's Requested Penalty Phase Instructions*

Although the trial court gave the jury the standard CALJIC penalty phase instructions, including CALJIC No. 8.85, defendant argues the court erred by rejecting his proposed 10 nonstandard penalty phase instructions. We disagree.

Defendant's proposed instruction No. 1 read: "In deciding whether death or life imprisonment without the possibility of parole is the appropriate sentence, you may not consider for any reason whatsoever the deterrent or non-deterrent effect of the death penalty or the monetary cost to the State of execution or maintaining a prisoner for life." The court properly rejected the instruction as unnecessary in light of other instructions setting forth proper factors for consideration. Neither cost nor deterrence was raised as an issue at the penalty phase, thus making the instruction unnecessary. (*People v. San Nicolas, supra*, 34 Cal.4th at p. 672.)

Defendant argues that the instruction was necessary, and that failure to give it was prejudicial, because Juror No. 6's responses to the jury questionnaire describe her concerns over the death penalty in terms of cost and deterrent effect. But Juror No. 6's response to the questionnaire expressed both a belief that a life sentence was preferable because it was "less costly" than a death sentence and doubt as to the death penalty's deterrent effect. This response shows that, in Juror No. 6's view, the factors of cost and deterrence weighed *against* imposing the death penalty. Thus, if the trial court had given defendant's proposed instruction telling the jury not to consider those factors, Juror No. 6 would have been *less* likely to vote for a life sentence.

Defendant's proposed instruction No. 2 read: "The mitigating circumstances that I have read for your consideration are given merely as examples of some of the factors that a juror may take into account as reasons for deciding not to impose a death sentence in this case. Any one of the factors may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case. But a juror should not limit his or her consideration of mitigating circumstances to these specific factors. [¶] A juror may also consider any other circumstances relating to the case or to the defendant as shown by the evidence as reasons for not imposing the death penalty. [¶] A mitigating circumstance does not have to be proved beyond a reasonable doubt. A juror may find that a mitigating circumstance exists if there is any evidence to support it. [¶] Any mitigating circumstance may outweigh all the aggravating factors. [¶] A juror is permitted to use mercy, sympathy and/or sentiment in deciding what weight to give each mitigating factor." The court properly rejected this instruction as duplicative, as the jury already had been instructed to consider sympathy for the defendant, to

consider "any fact" as a mitigating circumstance, and to weigh mitigating circumstances against aggravating circumstances. (*People v. Mickey, supra*, 54 Cal.3d at p. 695; *People v. Brasure* (2008) 42 Cal.4th 1037, 1070 [71 Cal.Rptr.3d 675, 175 P.3d 632] [proposed instruction to consider " 'mercy, sympathy and/or sentiment' " was duplicative of standard instruction given].) As to the other portions of the refused instruction, we have previously rejected similar claims. (*People v. Brasure, supra*, 42 Cal.4th at pp. 1068–1070 [the trial court has no duty to instruct the jury that it may find the existence of a mitigating circumstance if there is "any evidence to support it" and that it need not be proven "beyond a reasonable doubt"]; *People v. Clark* (1992) 3 Cal.4th 41, 163–164 [10 Cal.Rptr.2d 554, 833 P.2d 561] [the trial court has no duty to instruct the jury that it may consider sympathy and mercy for the defendant]; *People v. Mickey, supra*, 54 Cal.3d at p. 697 [rejecting as argumentative an instruction that a single mitigating circumstance can be dispositive].)

Defendant's proposed instruction No. 3 duplicated parts of his proposed instruction No. 2, and in addition stated: "If the mitigating evidence gives rise to compassion or sympathy for the defendant, the jury may, based upon such sympathy or compassion alone, reject death as a penalty." The trial court correctly concluded the instruction was duplicative of the CALJIC No. 8.85 instruction given here. (*People v. Hinton* (2006) 37 Cal.4th 839, 911 [38 Cal.Rptr.3d 149, 126 P.3d 981].)

Defendant's proposed instruction No. 4 read: "The People and the Defendant are entitled to the individual opinion of each juror. You must individually decide each question involved in the penalty decision." Defendant, however, later withdrew this proposed instruction, presumably because it was already included in the standard instructions. Defendant, therefore, cannot show error.

Defendant's proposed instruction No. 5 read: "Only those factors which are applicable on the evidence adduced at trial are to be taken into account in the penalty determination. All factors may not be relevant and a factor which is not relevant to the evidence in a particular case would be disregarded. The absence of a statutory mitigating factor does not constitute an aggravating factor." The trial court correctly refused the portion discussing the relevant factors as duplicative in light of the standard instruction given, and the portion discussing the absence of a mitigating factor was not required because none of the parties improperly suggested that the absence of a mitigating factor itself can be an aggravating factor. (*People v. Livaditis* (1992) 2 Cal.4th 759, 784 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

Defendant's proposed instruction No. 6 stated: "The factors in the above list which you determine to be aggravating circumstances are the only one

[*sic*] which the law permits you to consider. You are not allowed to consider any other facts or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case." The trial court correctly rejected this instruction as duplicative of the standard instruction given. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1275 [270 Cal.Rptr. 451, 792 P.2d 251].)

Defendant's proposed instruction No. 7 read: "Evidence has been introduced for the purpose of showing the specific harm caused by the defendant's crime. Such evidence, if believed, was not received and may not be considered by you to divert your attention from your proper role of deciding the appropriate penalty. You must face this obligation soberly and rationally, as you may not impose the ultimate sanction as a result of an irrational, purely subjective response to emotional evidence and argument. On the other hand, evidence and argument on emotional though relevant subject [*sic*] may provide legitimate reasons to sway you to show mercy." The trial court refused the instruction as unnecessary. We have repeatedly rejected this proposed instruction as both confusing and duplicative of CALJIC No. 8.84.1, which was given in this case. (*People v. Zamudio* (2008) 43 Cal.4th 327, 368–369 [75 Cal.Rptr.3d 289, 181 P.3d 105]; *People v. Harris* (2005) 37 Cal.4th 310, 358–359 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *People v. Ochoa* (2001) 26 Cal.4th 398, 455 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

Defendant's proposed instruction No. 8 stated: "A sentence of life without parole means that under the law the defendant is not eligible for parole." The trial court properly refused to give this instruction. (See *People v. Arias* (1996) 13 Cal.4th 92, 172 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Gordon, supra*, 50 Cal.3d 1223, 1277.)

Defendant's proposed instruction No. 9 stated: "You were previously instructed not to consider penalty in the guilt or innocence phase of the trial, and of course, that is your consideration in this phase. That instruction would be totally inapplicable. You will also be instructed at this time that you can consider sympathy for the defendant in deciding this continuing issue, and that was, of course, precluded from the guilt or innocence phase of the trial." This proposed instruction was duplicative of the standard instructions given. Therefore, the trial court's refusal to give this instruction was proper. (*People v. Frye* (1998) 18 Cal.4th 894, 1025 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Miranda* (1987) 44 Cal.3d 57, 102 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People v. Gates* (1987) 43 Cal.3d 1168, 1209 [240 Cal.Rptr. 666, 743 P.2d 301].)

Defendant's proposed instruction No. 10 was a lingering doubt instruction as to his guilt of attempting to commit a lewd act on Polly. The

trial court was under no duty to give this instruction as it is not required under state or federal law and "the lingering doubt concept is sufficiently encompassed in other instructions ordinarily given in capital cases." (*People v. Harris, supra*, 37 Cal.4th at p. 359; see also *People v. Slaughter* (2002) 27 Cal.4th 1187, 1219 [120 Cal.Rptr.2d 477, 47 P.3d 262]; *People v. Hines* (1997) 15 Cal.4th 997, 1068 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

Defendant's proposed instruction No. 11 was a modified version of CALJIC No. 8.85, deleting section 190.3, factors (e), (f), (g), and (j), which he deemed inapplicable. The trial court properly refused this instruction, recognizing that the full list of factors may be put before the jury as a framework for the penalty determination. (*People v. Perry* (2006) 38 Cal.4th 302, 319 [42 Cal.Rptr.3d 30, 132 P.3d 235]; *People v. Smith, supra*, 35 Cal.4th 334, 369; *People v. Raley, supra*, 2 Cal.4th at p. 919.)

### D. Claims of Juror Misconduct

Defendant contends that during the penalty phase deliberations the jury foreperson engaged in prejudicial misconduct when he read to the jury a note sent to him by a friend. Six days after the return of the penalty verdict and six weeks before defendant's sentencing, the jury foreman described the contents of that note in an article he authored, entitled *Condemned: How 12 men and women decided Richard Allen Davis should die*, which was published in the August 11, 1996, edition of the San Jose Mercury News. In that article, the foreperson explained: "I read a note to the jury in deliberations that had been mailed to me by a friend before we reached a verdict. It read: 'I wanted to send you this note of thanks before the jury reaches a verdict so that you know whatever decision is reached doesn't matter. You know how I feel about jury duty and the importance of it in our society. You and the other members have accepted a long and difficult assignment and done it well. As a body you have done much to restore faith, confidence, and integrity in the jury system. I'm sure I'm not alone in that thought.' " Before his sentencing, defendant moved for a new trial, arguing that this article constituted evidence of prejudicial juror misconduct. The trial court denied the motion without a hearing. We conclude the motion was properly denied under either state or federal law.

"It is, of course, misconduct for a juror to introduce any extrinsic material into the jury room." (*People v. Mincey* (1992) 2 Cal.4th 408, 483 [6 Cal.Rptr.2d 822, 827 P.2d 388], citing § 1137.) Juror misconduct or a nonjuror's contact or communication with a sitting juror ordinarily raises a rebuttable presumption of prejudice. (*In re Hamilton, supra*, 20 Cal.4th at p. 295.)

██ "The trial court has the discretion to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing," but such a hearing is not "a matter of right." (*People v. Avila* (2006) 38 Cal.4th 491, 604 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) Rather, it should be held only when the defense presents evidence indicating " 'a strong possibility that prejudicial misconduct has occurred' " and the court concludes a hearing is " 'necessary to resolve material, disputed issues of fact.' " (*Ibid.*, quoting *People v. Hedgecock* (1990) 51 Cal.3d 395, 419, 415 [272 Cal.Rptr. 803, 795 P.2d 1260].) On appeal, " '[a]ny presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.' " (*People v. Mendoza, supra*, 24 Cal.4th at p. 196.)

We perceive no reasonable probability of prejudice in this case. Although the foreman should not have read to the jury a note sent to him by a nonjuror, we agree with the trial court that the note was not prejudicial "by any stretch of imagination." The note did not refer to any extraneous evidence and did not contain any inflammatory rhetoric. As the trial court succinctly noted, the note was "simply a pat on the back" for the jury's service on this case, and it could not have biased any juror against defendant in any way.

Because the parties did not demonstrate the existence of any factual dispute regarding the note, the trial court's decision to deny the motion without holding a hearing was well within its discretion. (See *People v. Page* (2008) 44 Cal.4th 1, 58–59 [79 Cal.Rptr.3d 4, 186 P.3d 395]; *People v. Schmeck* (2005) 37 Cal.4th 240, 294 [33 Cal.Rptr.3d 397, 118 P.3d 451]; *People v. Brown* (2003) 31 Cal.4th 518, 582 [3 Cal.Rptr.3d 145, 73 P.3d 1137].)

### E. *Motion for Separate Guilt and Penalty Phase Juries*

During pretrial proceedings in both Sonoma and Santa Clara Counties, defendant repeatedly moved for separate guilt and penalty phase juries. He relied upon studies concluding that "death qualified" juries (juries selected by excluding prospective jurors whose views about the death penalty make them subject to challenge for cause) are more likely to convict defendants than juries that have not been death qualified. To prevent this from occurring, defendant argued, the trial court should use separate juries for the guilt and penalty phases, thereby eliminating the need to death qualify the guilt phase jury. Defendant argued that the great amount of publicity associated with this case increased the likelihood that if a single jury was used for the guilt and

penalty phases, that jury would be more likely to find him guilty than would be the case if the court used separate guilt and penalty juries. Defendant now contends the trial court erred in denying these motions. Not so.

■ Section 190.4, subdivision (c), expresses the Legislature's long-standing preference for a single jury to decide both guilt and penalty, and this preference does not violate a capital defendant's federal or state rights to due process, to an impartial jury, or to a reliable death judgment. (*People v. Bemore* (2000) 22 Cal.4th 809, 858 [94 Cal.Rptr.2d 840, 996 P.2d 1152].) This court and the United States Supreme Court have repeatedly rejected the claim that separate juries are required because jurors who survive the jury selection process in death penalty cases are more likely to convict a defendant. (*Lockhart v. McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]; *People v. Kraft* (2000) 23 Cal.4th 978, 1070 [99 Cal.Rptr.2d 1, 5 P.3d 68]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1212–1213 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 68–69 [168 Cal.Rptr. 128, 616 P.2d 1301].) Defendant here has provided no compelling reason for us to deviate from these holdings:

Defendant contends that the combined effect of pretrial publicity and publicity during the guilt phase of his capital trial required empanelment of a new jury for the penalty phase. But defendant has forfeited this issue on appeal, as he failed to renew his motion for a separate penalty phase jury at any time after the end of the guilt phase. Moreover, we have already concluded that the publicity associated with this case did not prejudice defendant's right to a fair and impartial jury.

F. *Cumulative Error*

Defendant argues that reversal of his murder conviction and death sentence is necessary because of the cumulative effect of errors in his trial. At the guilt phase, we assumed for the sake of argument that the trial court erred in failing to obtain a personal waiver of defendant's appearance during the jury's viewings of the crime scenes (see *ante*, at p. 611); that the court erred by admitting the prior crimes against Frances M., Mitchell, Kreiger and Frost as evidence of a common scheme or plan to steal and by admitting the prior crimes against Mitchell as evidence of a motive and a common scheme or plan to commit a sexual assault or a lewd act (see *ante*, at p. 604); and that the court erred in allowing Dr. Dietz to testify that defendant's crimes against Polly were consistent with those of a paraphiliac (see *ante*, at p. 605). With respect to the penalty phase, we assumed for the sake of argument that the prosecution erred in arguing to the jury that the notoriety of this case was a factor in aggravation (see *ante*, at p. 614), and that the admission of certain statements concerning three prior robberies committed by defendant violated

his right to confront adverse witnesses (see *ante*, at p. 620). Considered cumulatively, the assumed errors described above could not have prejudiced defendant.

### G. *Miscellaneous Constitutional Issues Concerning California's Death Penalty Law*

Defendant contends California's death penalty law is unconstitutional on several grounds. He recognizes that we have previously rejected similar claims, but he requests that we reconsider our prior decisions on these issues. As defendant presents no compelling reason for us to do so, we decline his request. Below, we discuss our previous decisions bearing on the claims raised here by defendant.

Defendant argues that the death penalty law in California violates the Eighth Amendment because it fails to "distinguish death-eligible and non-death-eligible first-degree murders in a meaningful and non-arbitrary way." This is simply a variant of the claim, which we have repeatedly rejected, that the statute does not sufficiently narrow the class of death-eligible defendants to only the most serious offenders. (*People v. Carey* (2007) 41 Cal.4th 109, 135 [59 Cal.Rptr.3d 172, 158 P.3d 743]; *People v. Demetrulias* (2006) 39 Cal.4th 1, 43–44 [45 Cal.Rptr.3d 407, 137 P.3d 229]; *People v. Perry, supra*, 38 Cal.4th at p. 322.)

Factor (a) of section 190.3, which permits the jury to consider both the circumstances of the crime and the existence of special circumstances as aggravating circumstances, does not impermissibly result in "double-counting" or automatically create a bias in favor of a death verdict. (*People v. Tafoya, supra*, 42 Cal.4th 147, 188; *People v. Kennedy* (2005) 36 Cal.4th 595, 641 [31 Cal.Rptr.3d 160, 115 P.3d 472]; *People v. Cain* (1995) 10 Cal.4th 1, 68–69 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

The use of the word "extreme" in section 190.3, factor (d), to qualify the mitigating factor of a defendant's "mental or emotional disturbance" does not impermissibly limit consideration of the factor in violation of the federal Constitution. (*People v. Kennedy, supra*, 36 Cal.4th at p. 641; *People v. Jenkins* (2000) 22 Cal.4th 900, 1054–1055 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Morales* (1989) 48 Cal.3d 527, 567–568 [257 Cal.Rptr. 64, 770 P.2d 244].)

Notwithstanding various social science studies cited by defendant, there was no reasonable likelihood that potential jurors would find the statutory definition of mitigation misleading or not easily understandable. (*People v. Griffin* (2004) 33 Cal.4th 536, 594 [15 Cal.Rptr.3d 743, 93 P.3d 344].)

As previously discussed on page 624, *ante*, a trial court is not required to delete any inapplicable factors from the list of statutory factors presented to the jury. (*People v. Kennedy, supra*, 36 Cal.4th at p. 641.)

The trial court need not instruct the jury that a life sentence is mandatory if circumstances in aggravation do not outweigh those in mitigation. (*People v. Carey, supra*, 41 Cal.4th 109, 137; *People v. Medina* (1995) 11 Cal.4th 694, 781–782 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Duncan* (1991) 53 Cal.3d 955, 978 [281 Cal.Rptr. 273, 810 P.2d 131].)

A death penalty determination, because it is inherently moral and normative, is "not susceptible to a burden-of-proof quantification," and thus there is no requirement that the penalty phase jury find beyond a reasonable doubt that individual aggravating factors exist, that the aggravating factors substantially outweigh the mitigating ones, or that death is the appropriate penalty. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118]; see also *People v. Demetrulias, supra*, 39 Cal.4th 1, 40; *People v. Snow* (2003) 30 Cal.4th 43, 126 [132 Cal.Rptr.2d 271, 65 P.3d 749].) There is also no requirement that the jury must reach unanimity on which aggravating factors apply. (*People v. Smith, supra*, 35 Cal.4th 334, 374; *People v. Carey, supra*, 41 Cal.4th 109, 136; *People v. Kennedy, supra*, 36 Cal.4th at p. 641.)

Prosecutorial discretion in deciding whether to seek the death penalty is constitutional. (*People v. Demetrulias, supra*, 39 Cal.4th 1, 43; *People v. Snow, supra*, 30 Cal.4th 43, 126; *People v. Keenan* (1988) 46 Cal.3d 478, 505 [250 Cal.Rptr. 550, 758 P.2d 1081].)

H. *Delay in the Capital Postconviction Process and Execution of Sentence*

Defendant argues that the delay in California's death penalty postconviction process has resulted in an extended incarceration on death row, thus constituting cruel and unusual punishment in violation of the federal Constitution's Eighth Amendment. We have rejected similar claims, and we see no compelling reason to reconsider those decisions here. (*People v. Demetrulias, supra*, 39 Cal.4th 1, 45; *People v. Dunkle* (2005) 36 Cal.4th 861, 942 [32 Cal.Rptr.3d 23, 116 P.3d 494]; *People v. Snow, supra*, 30 Cal.4th 43, 127.)

I. *Unconstitutionality of Lethal Injection*

Defendant contends that lethal injection, as a method of execution, is unconstitutional under the Eighth Amendment to the federal Constitution. A claim of alleged deficiencies in the method of a future execution is not

cognizable on appeal because it does not affect the validity of the judgment. (*People v. Demetrulias, supra,* 39 Cal.4th 1, 45.) In any event, anecdotal evidence of "botched" lethal injections in other states is insufficient here to compel further scrutiny under the Eighth Amendment. (*People v. Snow, supra,* 30 Cal.4th at pp. 127–128; *People v. Holt* (1997) 15 Cal.4th 619, 702 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

## DISPOSITION

We affirm the judgment in its entirety.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 26, 2009, and the opinion was modified to read as printed above.